**Michael E. Haglund**, OSB No. 772030
Email:  mhaglund@hk-law.com
**Christopher G. Lundberg,** OSB No. 941084
Email: clundberg@hk-law.com
**Eric J. Brickenstein**, OSB No. 142852
Email:  ebrickenstein@hk-law.com
**Christopher T. Griffith**, OSB No. 154664
Email:  cgriffith@hk-law.com
**HAGLUND KELLEY LLP**
2177 SW Broadway
Portland, OR  97201
Phone:  (503) 225-0777
Facsimile:  (503) 225-1257

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### (Pendleton Division)

| | |
|---|---|
| **MALHEUR FOREST FAIRNESS COALITION,** an unincorporated association; **PRAIRIE WOOD PRODUCTS, LLC,** an Oregon limited liability company**; RUDE LOGGING LLC**, an Oregon limited liability company; **BRETT MORRIS,** an individual; **MORRIS FORESTRY LLC**, an Oregon limited liability company; **ENGLE CONTRACTING, LLC,** an Oregon limited liability company; **H TIMBER CONTRACTING LLC**, an Oregon limited liability company; **DOUG and DARRELL EMMEL**, doing business as **EMMEL BROTHERS RANCH**; and **PAT and HEDY VOIGT**, doing business as **RICCO RANCH**,<br><br>                    Plaintiffs,<br>          v.<br><br>**IRON TRIANGLE, LLC**, an Oregon limited liability company; **I.T. LOGGING, INC.** an Oregon corporation; and **RUSSELL YOUNG**, an individual,<br><br>                    Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)** |

## INTRODUCTION

1.      This is an action under the federal antitrust laws, the Sherman Act and the

Clayton Act, which prohibit monopolization in any segment of U.S. commerce. In just over nine

years, defendants Iron Triangle LLC, I.T. Logging Inc. and their owner Russell Young

(collectively, "Iron Triangle") have aggressively deployed a complex scheme that has delivered

dominant monopoly and monopsony positions to defendants in four markets in a geographically

distinct market area consisting of the Malheur National Forest and private forestlands in Grant

County and the northern third of Harney County, Oregon (hereafter, the "MNF Market Area").

As explained in detail below, Iron Triangle has ruthlessly wielded its dominance of these

markets to stunt economic development in Grant and Harney counties while coopting enormous

federal resources intended to develop and sustain the region's timber sector.

2.      The four relevant antitrust markets in which Iron Triangle holds a monopoly

(seller power) or monopsony (buyer power) in the MNF Market Area are the following: (1) as a

seller in the market for forest stewardship services such as precommercial thinning, road

maintenance and fire risk reduction projects on the Malheur National Forest (the "Stewardship

Services Market"); (2) as a buyer in the market for timber harvest rights from public and private

forestland owners (the "Harvest Rights Market"); (3) as a seller in the market for contract

logging services (the "Logging Services Market"); and (4) as a seller in the market for softwood

sawlogs (the "Softwood Sawlog Market"). In each of these markets, Iron Triangle holds a

stunning market share of at least 90%. While economically distinct, each of the four markets that

Iron Triangle dominates constitutes a key interrelated component of what can be characterized

broadly as the Grant and Harney County forestry and timber sector. Iron Triangle's power in

Page 1 – COMPLAINT

each market cross pollinates, and the application of anticompetitive tactics in one market is often critical to maintaining Iron Triangle's monopoly in another.

3.       To understand how Iron Triangle maintains its grip on this region's timber-dependent economy, it is necessary to first understand the history of how Iron Triangle achieved dominance. In 2012, the U.S. Forest Service solicited bids for an unprecedented 10-year forest stewardship contract on the Malheur National Forest. The stewardship contract's objective was to revive the local timber industry by guarantying sustainable harvest consistent with sound conservation principles, while also promoting the health of the forest through management practices such as pre-commercial thinning. The massive $69 million contract included, among other things, the first option to acquire an unheard-of 70% share of the timber harvest on the Malheur National Forest.

4.       In 2013, Iron Triangle was awarded the entire contract based on its promises to maximize the contract's economic benefits within the contractually defined "local community" of Grant and Harney counties, and to utilize local loggers (including plaintiffs Rude Logging, LLC; Morris Forestry LLC; and Engle Contracting, LLC) to perform contract logging and stewardship services. Put simply, Iron Triangle won the stewardship contract by assuring the Forest Service in its written proposal that it would administer the contract in a manner that diversified the local economy and promoted the public interest. Once the contract was secured, however, Iron Triangle did the exact opposite.

5.       Rather than perform its responsibilities under the stewardship contract in a manner consistent with its promises and the public interest, Iron Triangle promptly began leveraging its newly minted monopoly in the Harvest Rights Market to crush competition and

Page 2 – COMPLAINT

assert its dominance in the adjacent Stewardship Services, Logging Services and Softwood Sawlog Markets.

6.      During the past decade, Iron Triangle has exploited the stewardship contract to hoard enormous volumes of forestland timber under contract. This practice – which Iron Triangle has maintained through the use of performance extensions obtained from the Forest Service based on blatant misrepresentations regarding its logging capacity – has the dual anticompetitive purpose of restricting softwood sawlog output (and thereby raising prices to supra-competitive levels) while simultaneously weakening Iron Triangle's competitors by starving them of public contract logging and stewardship opportunities in the MNF Market Area.

7.      Iron Triangle buttresses this exclusionary tactic through a truly diabolical tying arrangement that it has imposed on John Day's only sawmill, Malheur Lumber Co. Under this arrangement, Iron Triangle has agreed to supply all of Malheur Lumber's sawlog requirements if, and only if, Malheur Lumber abstains from purchasing softwood sawlogs and contract logging services from Iron Triangle's competitors in the MNF Market Area. Because Iron Triangle's monopoly of the Softwood Sawlog Market enables it to destroy Malheur Lumber at any time by withholding log supply, Malheur lumber has no choice but to accede to Iron Triangle's demand. Incredibly, Iron Triangle enforces this condition through a contract that allows it to directly oversee and manage Malheur Lumber's log yard.

8.      In part because an open and continuing refusal by Malheur Lumber to purchase sawlogs or contract logging services from Iron Triangle's competitors within the MNF Market Area would raise immediate antitrust suspicion, Malheur Lumber instead accomplishes the same end by either telling prospective pine sawlog sellers that it does not need any sawlogs at the time of the inquiry or offering to purchase sawlogs at prices that are uneconomical to contract loggers

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

and private landowners while at the same time privately paying Iron Triangle much higher prices for sawlogs harvested from the Malheur National Forest. This tactic, imposed by Iron Triangle, has multiple insidious effects. First, by making logging on private lands uneconomical, Iron Triangle further restricts sawlog output and thereby strengthens its ability to charge supra-competitive prices. (Ironically, while Iron Triangle was awarded the stewardship contract in part to reduce fire risk on public lands, its exploitation of that contract has in fact *raised* fire risk by stifling private timberland harvest.) Second, because the Forest Service considers Malheur Lumber's published log prices in appraising the value of its stewardship-based timber sales, Iron Triangle is able to acquire these sawlogs as part of its stewardship contract at artificially depressed prices, further strengthening its ability to exclude rivals and extract monopoly profits.

9.      On July 11, 2022, Prairie Wood Products, LLC ("Prairie Wood") reopened its Prairie City mill – originally founded in 1977 – following a 2009 shutdown brought on by the Great Recession. Consistent with its historic focus, Prairie Wood manufactures structural dimension lumber (2 x 4s and 2 x 6s) primarily from Douglas fir and white fir logs sourced from the MNF Market Area. The reopening of Prairie Wood's stud mill – which currently employs 43 local workers in family wage jobs – should represent a major victory for the local economy and a testament to the success of Forest Service's collaborative forest stewardship program. As U.S. Senator Ron Wyden stated in celebration of the mill's reopening:

> The well-being of Oregon's signature forest products industry is a must, both to generate rural private-sector jobs and to protect our public lands from wildfires threatening communities throughout our state. . . . I welcome today's announcement both for Grant County and the collaborative efforts I have long championed that provide opportunities for local jobs and healthy landscapes.

The significant achievement of Prairie Wood's reopening, however, is currently at extreme risk of being snuffed out within a matter of months by Iron Triangle's anticompetitive scheme.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

10.     Ordinarily, a competitive log seller in the MNF Market Area would welcome market entry by a local buyer like Prairie Wood Products because this new local log sales outlet dramatically improves both efficiency by reducing transportation costs and profits. Iron Triangle, however, has outright refused to sell Prairie Wood any softwood sawlogs whatsoever despite controlling more than 95% of supply. Instead, Iron Triangle routinely hauls logs *directly past* Prairie Wood Products' mill to distant mills outside the MNF Market Area in Elgin, Pilot Rock and La Grande. The only plausible motive for Iron Triangle's otherwise inexplicable refusal to deal with Prairie Wood in favor of uneconomically shipping logs outside the MNF Market Area is its determination to eliminate the perceived threat that a thriving Prairie Wood presents to Iron Triangle's monopsonies in the Harvest Rights Market and Logging Services Market and, in particular, as a potential bidder on the renewal of the 10-year stewardship contract scheduled to be bid in March 2023.

11.     Plaintiffs expect that Iron Triangle will falsely claim that it cannot sell to Prairie Wood because its sawlogs are "spoken for" – i.e., committed by contract to other mills outside the MNF Market Area. Any such claim is belied, by the 126 million board feet of forestland timber rights that Iron Triangle has stockpiled under contract, which represents more than two years of the log volume requirements of its customers.  Simply put, the only barrier to Iron Triangle selling softwood logs is its desire to maintain its monopoly/monopsony power by restricting sawlog output, curtailing its rivals contract logging opportunities and eliminating Prairie Wood as a potential competitor in Grant and Harney counties.

12.     Throughout the past decade, Iron Triangle has successfully exploited the Forest Service's government grant of market power through the 10-year stewardship contract to weaken and exclude its rivals while consolidating federal resources intended to create economic

Page 5 – COMPLAINT

development opportunities for the broader community in its own coffers. Iron Triangle has been so effective in this regard that it has received more than three times the contract's $69 million allocation in revenue and resources obtained from the Forest Service. Iron Triangle has used this windfall, in turn, to bid timber sales that occur outside the stewardship context at predatory levels, depriving its competitors of a source of sawlogs, and further consolidating its stranglehold on the Harvest Rights and Softwood Sawlog Markets.

13.     The current 10-year stewardship contract is now in its final year and is expected to be rebid for renewal in the first quarter of 2023. Iron Triangle's continued dominance of each of the four timber sector markets in the MNF Market Area is dependent on its ability to retain exclusive control of a renewed stewardship contract. That outcome, in turn, depends on Iron Triangle's ability to crush viable alternative bidders including Prairie Wood. Thus, to maintain its monopoly and monopsony positions, Iron Triangle is willing to go to extraordinary lengths, up to and including starving Prairie Wood of sawlogs and jeopardizing the livelihoods of its 43 employees. Sadly, Iron Triangle's brutal exclusion of its rivals directly undermines the intended community benefits that are at the heart of the stewardship program that Iron Triangle has entirely appropriated to its own private gain.

14.     There is no question that the public servants at the Forest Service and elected officials including Senator Wyden who have vigorously supported the forest stewardship program have only the best intentions and are motivated by a sincere desire to promote a vibrant and competitive timber economy. But the 2013 decision to award Iron Triangle 100% of the 10-year stewardship created conditions that have enabled a bad actor to secure overwhelmingly dominant monopolies in four markets and, of course, the immense profits that flow from the systematic exclusion of its rivals.

Page 6 – COMPLAINT

15.     The upcoming expiration and anticipated renewal of the stewardship contract presents a critical (and singular) opportunity to break Iron Triangle's grip and restore competitive conditions to the economically vital timber sector in the MNF Market Area. But that can only be achieved if Iron Triangle is stopped from emasculating its potential rivals by depriving them of commerce, thereby driving them from the market or sufficiently weakening these competitors so as to preclude their meaningful participation in the bidding process.

16.     With bidding on a new stewardship contract set to occur in the first quarter of 2023, it is imperative that two of Iron Triangle's most egregious anticompetitive tactics, namely its refusal to sell softwood sawlogs to Prairie Wood and the tying arrangement imposed on Malheur Lumber – both of which are illegal – be immediately enjoined and that Iron Triangle also be enjoined from bidding on two upcoming timber sales in order to stop defendants' progression from a near pure monopoly in the Harvest Rights Market (currenty 96%) to a 100% pure monopoly. Contemporaneous with this filing, plaintiffs are moving for a temporary restraining order to prevent Iron Triangle from increasing its already overwhelming market power by predatorily bidding for 20 million board feet in two Harvest Rights contracts in the second half of September 2022.

17.     The massive scope of Iron Triangle's monopolization scheme, which now holds an iron grip on all of the forestry sector economic opportunities in the MNF Market Area except sawlog manufacturing, has generated no less than four sets of victims. These include imposing ongoing losses on the recently reopened Prairie Wood Products sawmill, foreclosing contract loggers from the Stewardship Services, Harvest Rights and Logging Services Markets, rendering the forestlands of private landowners both wildfire prone and effectively valueless and

substantially increasing the wildfire risk to the citizens of Grant and Harney counties due to lack

of fire risk reduction treatments on private forestland.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the federal antitrust claims in this action pursuant

to 28 U.S.C. §§ 1331 and 1337.  Venue in this district is proper under 28 U.S.C. § 1391, as the

defendants transact business and maintain offices within this district, and a substantial part of the

events giving rise to plaintiffs' claims occurred within this district.

## PARTIES

19.     Plaintiff Malheur Forest Fairness Coalition is an unincorporated association of the

plaintiffs in this case and members of the Grant and Harney County communities interested in

restoring free and open competition within the forest products industry in the MNF Market Area

that is an important component of the local economy.

20.     Plaintiff Prairie Wood Products, LLC is an Oregon limited liability company

headquartered in Prairie City, Oregon that has been owned by the DR Johnson family since

1977. Until the Great Recession forced its closure in 2009, the Johnson family's predecessor

company, Prairie Wood Products, Inc., operated a sawmill producing structural lumber and a co-

generation plant that employed over 100 workers on two shifts for over 30 years. The sawmill

was reopened on July 11, 2022 and currently employs 43 workers in family-wage jobs on one

shift.  The cogeneration facility, which is in the process of being re-permitted, operated for over

20 years at close to its 9.5 megawatt turbine capacity. This plant has the potential to play an

important role in the forest restoration work within the MNF Market Area by utilizing 70,000

tons per day of non-merchantable forest biomass, which equates to the equivalent of 21 semi-

truck loads per day. A 1986 photograph of the Prairie Wood Products manufacturing complex,

Page 8 – COMPLAINT

which remains intact, is attached as Exhibit A.  Processed forest biomass and the cogeneration facility can be seen in the lower right-hand portion of the photo.

21.     Plaintiff Rude Logging LLC is an Oregon limited liability company engaged in the business of purchasing public timber sales, providing contract logging services and fighting wildfires. The company is headquartered in John Day, Oregon and employs 23 workers.

22.     Plaintiff Brett Morris owned and operated Morris Forestry as a sole properitorship providing contract logging services before registering the plaintiff Morris Forestry LLC, an Oregon limited liability company, in March 2020.  The company is headquartered in John Day, Oregon and employs three workers.

23.     Plaintiff Engle Contracting, LLC is an Oregon limited liability company engaged in the business of purchasing public timber sales, providing contract logging services, forest stewardship contract services and fighting forest fires. The company is headquartered in Monument, Oregon and employs four workers.

24.     Plaintiff H Timber Contracting LLC is an Oregon limited liability company engaged in the business of providing contract logging services. The company is headquartered in Burns, Oregon and employs three workers.

25.     Plaintiffs Doug and Darrell Emmel are the owners of a 4,000-acre ranch near John Day, Oregon that does business as Emmel Brothers Ranch. The ranch owns approximately 2,000 acres of productive forestland.  Plaintiffs Patrick and Hedy Voigt are the owners of an 8,500-acre ranch near John Day, Oregon that does business as Ricco Ranch.  The ranch owns nearly 4,000 acres of productive forestland.

26.     Defendant Iron Triangle, LLC is an Oregon limited liability company headquartered in John Day, Oregon engaged in the businesses of providing forest stewardship

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

services, purchasing and performing public timber sale contracts, providing contract logging services and the selling of softwood sawlogs and pulp logs. Defendant I.T. Logging, Inc. is an Oregon corporation that performs one or more of the same lines of business performed by Iron Triangle, LLC. Defendant Russell Young is the sole owner of defendants Iron Triangle, LLC and I.T. Logging, Inc.

## IRON TRIANGLE'S MONOPOLY OR MONOPSONY POWER IN FOUR RELEVANT PRODUCT MARKETS IN THE MALHEUR NATIONAL FOREST MARKET AREA.

27.     Iron Triangle possesses monopoly and/or monopsony power and currently holds at least 95% market shares in each of the following four economically distinct product markets within the MNF Market Area: (1) as a seller in the Stewardship Services Market; (2) as a buyer in the Harvest Rights Market; (3) as a seller in the Logging Services Market; and (4) as a seller in the Softwood Sawlog Market. As addressed in turn below, each of these markets experience significant barriers to entry and are geographically constrained to the MNF Market Area primarily by economic factors including transportation costs.

### The Stewardship Services Market.

28.     The Stewardship Services Market is defined as consisting of the purchase and sale of forest stewardship services including precommercial thinning, road maintenance, fire risk reduction and related services performed in the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestlands in Grant County and the northern third of Harney County.

29.     The Stewardship Service Market is characterized by high barriers to entry due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

30.     The Stewardship Services Market is geographically constrained to the MNF Market Area including the 1.7 million acre territorial expanse of the Malheur National Forest and the surrounding or inholding private forestlands in the MNF Market Area.  The cost and time of mobilizing and demobilizing the equipment necessary to perform the required stewardship services precludes businesses from operating over larger geographic areas.  Thus, the stewardship services that comprise this market can only be performed within the MNF Market Area, and only firms located within a reasonably accessible distance of the Malheur National Forest are capable of performing stewardship services within the MNF Market Area.

31.     Currently, Iron Triangle holds a pure monopoly in the Stewardship Services Market with a 100% market share following the Forest Service's 2013 award of a 10-year stewardship contract, its purchase of short-term stewardship contracts on the Malheur National Forest with remaining volume under contract and its foreclosure of forest stewardship opportunities on private forestland in the MNF Market Area.

**The Harvest Rights Market**.

32.     The Harvest Rights Market is defined as consisting of the acquisition and sale of the right to harvest timber in the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestlands in Grant County and the northern third of Harney County. The Harvest Rights Market is geographically constrained to the MNF Market Area by the limited distance that logs harvested pursuant to those rights can be economically transported to a manufacturing plant such as a sawmill.

33.     The Harvest Rights Market experiences high barriers to entry due in significant part to the Forest Service's award of a 10-year stewardship contract to Iron Triangle that grants it the first right of refusal to purchase harvest rights to timber located on the Malheur National

Page 11 – COMPLAINT

Forest that comprises no less than 70% of available volume within the MNF Market Area. Further, Iron Triangle has erected artificial barriers to entry through anticompetitive tactics that include predatory bidding on public timber sales and suppressing the value of private timberland harvest rights through the tying arrangement it imposes on Malheur Lumber.

34.    Currently, Iron Triangle holds a near pure monopsony in the Harvest Rights Market with a 96.6% market share as of December 31, 2021.

**The Logging Services Market**.

35.    The Logging Services Market is defined to include the purchase and sale of contract logging services within the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestland in Grant County and the northern third of Harney County. The Logging Services Market is geographically constrained to the MNF Market Area by the limited distance that contract loggers can economically haul softwood sawlogs to a manufacturer.

36.    The Logging Services Market is characterized by high barriers to entry due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services. In addition, Iron Triangle has erected artificial barriers to entry through anticompetitive tactics including the tying arrangement imposed on Malheur Lumber which reduces the value of private timberland and thereby distorts and suppresses the economic incentive for private landowners and contract loggers to purchase or perform contract logging services on private forestlands.

37.    Currently, Iron Triangle holds a near pure monopoly in the market for contract logging services with a more than 95% market share.

**The Softwood Sawlog Market**.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

38.     The Softwood Sawlog Market is a commodity market for the purchase and sale of softwood sawlogs of the ponderosa pine, lodgepole pine, Douglas fir, white fir and larch species harvested in the MNF Market Area consisting of public and private forestlands located in Grant County and the northern half of Harney County.  The Softwood Sawlog Market is geographically constrained to the MNF Market Area by the limited distance that sawlogs can be economically transported to a manufacturer such as a sawmill.

39.     The principal barrier to entering the Softwood Sawlog Market as either a buyer or a seller is Iron Triangle's near total control of softwood sawlog supply through its dominance of the Harvest Rights Market and Logging Services Market. Currently, Iron Triangle holds a near pure monopoly in the Softwood Sawlog Market with a more than 95% market share. In particular, Iron Triangle's refusal to sell sawlogs to entrant Prairie Wood poses an imminent threat to Prairie Wood's survival.

## 2012-2022: IRON TRIANGLE'S WILLFUL ACQUISITION OF MONOPOLY OR MONOPSONY POWER IN FOUR MARKETS

40.     In the fall of 2013, following the award of the 10-year stewardship contract, Iron Triangle subcontracted logging services to some of the loggers identified in its bid, including plaintiffs Rude Logging LLC and Engle Contracting, LLC.  The contracts established logging service rates of $24 per ton for all logging services from "stump to truck," which included falling, bucking, skidding and decking of logs plus loading aboard log trucks. The contracts also specified log trucking rates per ton for deliveries to the different locations of the mills purchasing the logs.

41.     One year later in October 2014, Iron Triangle presented contracts to the same group of loggers but at reduced rates that also targeted timber stands where logging was less efficient and thus more costly due to lower log quality and lower harvest volume per acre.

Page 13 – COMPLAINT

Plaintiff Engle Contracting, LLC declined to log at such uneconomic rates. Plaintiff Rude Logging, LLC accepted the reduced contract rates and performed the 2014 contract and performed additional logging contract services for Iron Triangle in 2015 and part of 2016, but barely covered its costs with little or no profit. Rude Logging declined to accept uneconomic contract proposals from Iron Triangle in the fourth year of the 10-year stewardship contract or thereafter.

42.      In presenting uneconomic forest stewardship and logging service contracts to purchase and contract loggers in 2014 and 2015, Iron Triangle was pursuing a deliberate anti-competitive strategy to eliminate these logging companies from competing with Iron Triangle in the MNF Market Area.

43.      During the process of eliminating the participation of local loggers in the performance of forest stewardship and logging services, Iron Triangle used a pattern and practice of false representations regarding its financial performance both to Forest Service personnel administering the 10-year forest stewardship contract and to Oregon Senator Ron Wyden's office, which had a keen interest in the success of the relatively novel use of multi-year forest stewardship contracts on national forests. As a result of Iron Triangle's aggressive pressure campaign based on blatantly false misrepresentations and strong political support from Senator Wyden's office, which accepted defendants' misrepresentations as the truth, the Forest Service repeatedly approved forest stewardship service contract rates and/or subsidies to Iron Triangle at monopoly or supra-competitive rates that have, to date, more than tripled the original $69 million "not to exceed" cost of the 10-year stewardship contract.

44.      As just one example, when Iron Triangle negotiated Task Order 2 for the second year of the 10-year stewardship contract in the summer of 2014, its combination of false

Page 14 – COMPLAINT

representations and political pressure secured through those misrepresentations resulted in

shockingly high monopoly profits. Specifically, for the timber volume to be removed totaling

approximately 50 million board feet, Iron Triangle was paid rates of approximately $63 per ton

to harvest, remove and deliver the logs generated in the harvest to multiple manufacturers in

eastern Oregon. These rates exceeded the cost of logging and trucking as demonstrated by the

significantly lower rates that Iron Triangle paid to contract loggers and truck haulers during that

second year of the stewardship contract. There is no question that the logging and hauling rates

approved by the Forest Service for Task Order 2 were supra-competitive monopoly rates.

45.    But even more significantly from a financial perspective, the value of the 50

million board feet in authorized sawlog timber removals in Task Order 2 was negotiated by Iron

Triangle in an incredibly aggressive fashion and ultimately approved by the Forest Service at a

rate of just $0.34 per ton or, utilizing the Forest Service's standard conversion factor of six tons

per thousand board feet, $2.04 per thousand board feet ("MBF"). As of 2014, a conservative

average of the log prices being paid by the eastern Oregon sawmills and plywood plant

purchasing sawlogs from Iron Triangle was $400 per MBF. Without considering the profits

flowing from the difference between its actual logging and truck hauling costs and the rates

being paid by the Forest Service, Iron Triangle's profits on the sale of the 50 million board feet in

sawlogs alone, which were virtually given away at a price of just over $2 per MBF and then sold

for an average of $400 per MBF, was nearly $20 million (50,000 MBF x $397.96).

46.    Armed with the inflow of monopoly profits paid by the Forest Service for forest

stewardship services billed at excessive rates for Task Order 2 performed in 2014 through 2016,

Iron Triangle proceeded to consolidate its monopsony position in the market for timber harvest

rights by engaging in predatory bidding practices, outbidding competing loggers for over 90% of

Page 15 – COMPLAINT

the volume in open market timber sales comprising the remaining 30% of the annual timber harvest offered by the Malheur National Forest during each of the calendar years from 2016 through 2021.  In 2016 and part of 2017, Iron Triangle made it a practice at the oral ascending auctions for timber sales to continue bidding until the last competitor dropped out. During this timeframe, Iron Triangle successfully used this practice to outbid every competitor on a total of nine timber sales.

      47.     When the Forest Service changed the bidding procedure in mid-2017 from oral auctions to sealed bids in an effort to foster increased competition, Iron Triangle simply redeployed a share of its monopoly profits obtained from overpriced forest stewardship services to implement aggressive, predatory sealed bids which far exceeded the second high bid in an obvious effort to eliminate competition for open market timber sales sold on the Malheur National Forest.

      48.     In September 2018 and January 2019, Iron Triangle submitted sealed bids at predatory levels on the Conroy timber sale that included 23.1 million board feet and the Coxie timber sale been included 12.9 million board feet. On these two sales, Iron Triangle's bids were submitted at predatory levels in that Iron Triangle bid at a level that it knew no possible competitor would match or exceed and which imposed a loss on Iron Triangle because ita sawlog sale revenues from the timber sale fell below all of its costs for stumpage, logging and truck hauling. On the Conroy timber sale, Iron Triangle bid 2.72 times higher than the second high bidder, bidding $1,356,012 compared to the second highest bid of $496,343.  On the Coxie timber sale, Iron Triangle's bid was 1.44 times higher than the second high bid.

      49.     In 2021, Iron Triangle submitted predatory bids for the Ruby timber sale that included 3.86 million board feet and the R & R timber sale that included 6.0 million board feet.

Page 16 – COMPLAINT

These predatory bids, both of which impose losses on Iron Triangle, were 1.56 and 1.76 times the second highest bids, respectively. Plaintiff Rude Logging was one of the top unsuccessful bidders on three of the four predatorially bid timber sales described above.

50.     By the end of 2021, Iron Triangle's preclusive bidding practices had achieved overwhelmingly dominant monopsony power over the acquisition of timber harvest rights on the Malheur National Forest, securing 13 of 14 sales of any size (volume greater than 200 MBF) in those three years and over 95% of the offered volume. A chart showing Iron Triangle's relentless march toward nearly pure monopoly power between 2011 and the beginning of 2022 is set out on the following page. This chart shows that Iron Triangle moved from holding just over 50% of the volume under contract on the Malheur National Forest in 2012 to 96.6% as of January 1, 2022. During the 11 years between December 31, 2011 and January 1, 2022, Iron Triangle more than quintupled its volume under contract from 22.3 million board feet to 128.3 million board feet at the end of 2021.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201



HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

51.     To further cement its monopsony position in the market for timber harvest rights from both public and private lands in the MNF Market Area, Iron Triangle in 2020 successfully imposed an illegal tying condition on the only purchaser of pine sawlogs in the market area, Malheur Lumber Co. in John Day, Oregon. Malheur Lumber would ordinarily source pine sawlogs through three markets: acquisition of timber harvest rights from the Forrest Service or private landowners, direct purchase of sawlogs from logging companies or through participation in contract logging agreements between loggers and private landowners. Wood products manufacturers engage in the contract logging market by agreeing to purchase at a specified price logs harvested under these agreements, thereby enabling such arrangements to move forward.

52.     As of the beginning of 2020, Iron Triangle had amassed a volume of timber under contract in the MNF Market Area of 95.3 million board feet at that point, which included over two years' worth of the annual pine sawlog requirements for Malheur Lumber Co. Iron Triangle conditioned its willingness to sell pine sawlog requirements to Malheur Lumber Co. on the commitment of Malheur Lumber Co. not to purchase pine sawlogs from any other logger harvesting on the Malheur National Forest, or agree to purchase pine sawlogs generated from contractual arrangements between contract loggers and private landowners in the MNF Market Area.  In effect, Iron Triangle tied its sale of pine sawlogs to the condition that Malheur Lumber also purchase all contract logging services exclusively from Iron Triangle.

53.     Given Iron Triangle's monopoly power over the sale of pine sawlogs in the MNF Market Area, Malheur Lumber Co. required Iron Triangle's pine sawlog supply to sustain its own business and had little choice but to accede to Iron Triangle's demands. Since this boycott requirement applied to both the direct purchase of pine sawlogs and to acquisition of logs through the separate contract logging market, Iron Triangle's actions constitute a *per se* illegal

Page 19 – COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

tying arrangement. Malheur Lumber Co. has complied with Iron Triangle's requirements by simply refusing to purchase pine sawlogs from loggers or to participate in contract logging arrangements between contract loggers and private landowners in the MNF Market Area, or by accomplishing the same result indirectly by offering uneconomically low prices for those logs.

54.     Malheur Lumber Co.'s compliance with the tying requirement by quoting purchase prices below suppliers' costs of production confers an additional benefit on Iron Triangle.  When the Forest Service appraises either an independent timber sale or the timber included in an Iron Triangle stewardship contract, that timber is appraised based upon sale to a manufacturer in John Day, specifically Malheur Lumber Co. With the benefit of artificially low prices quoted by Malheur Lumber Co., the relevant appraisals understate the true value of the timber to the benefit of Iron Triangle.

55.     The impacts of the illegal tying arrangement imposed on Malheur Lumber Co. by Iron Triangle have been widespread. Private landowners throughout the market area including two members of the plaintiff coalition (Doug and Darrell Emmel and Pat and Hedy Voigt) have been foreclosed from harvesting softwood sawlogs on their properties because the only available pine sawmills willing to purchase their logs are located so far away that the landowner not only receives no return, but must pay contract logging service and trucking costs that exceed the delivered log values to those mills. In addition, by rendering timber harvest on private lands uneconomic within the MNF Market Area, independent logging contractors including four members of the plaintiff coalition (Rude Logging LLC, Morris Forestry LLC, Engle Contracting, LLC and H Timber Contracting LLC) have been substantially foreclosed from the market for logging services within the MNF Market Area, leaving Iron Triangle standing alone as the dominant seller of contract logging services in the MNF Market Area.

Page 20 – COMPLAINT

56.     The combination of Iron Triangle's market power in the markets for forest stewardship services, timber harvest rights, and contract logging services has effectively foreclosed its competition from acquiring timber harvest rights or providing contract logging services to private landowners, enabling Iron Triangle to establish a monopoly position as a seller of sawlogs within the MNF Market Area. Iron Triangle is utilizing its monopoly position to extract monopoly or supra-competitive prices from Malheur Lumber Co. for the pine sawlogs delivered to its mill. In other words, Iron Triangle is setting higher prices for these logs than would be paid by Malheur Lumber Co. in a competitive log market in the MNF Market Area.

57.     In the most recent development demonstrating Iron Triangle's absolute commitment to maintaining its four monopoly/monopsony positions, defendant is refusing to sell sawlogs to Prairie Wood Products, LLC, which reopened its sawmill in Prairie City on July 11, 2022. When it reopened, Prairie Wood Products anticipated that Iron Triangle would gladly sell Douglas fir and white fir logs harvested on the Malheur National Forest to a mill in Prairie City rather than haul those logs north over 140 miles at substantial cost to a plywood plant located outside of the MNF Market Area in Elgin, Oregon. Instead, Iron Triangle is refusing to do business with Prairie Wood Products in order to force the company out of business.

58.     Shockingly, when Prairie Wood Products timber manager Dan Bishop contacted Iron Triangle to discuss the purchase of fir sawlogs, Iron Triangle owner Russell Young stated: "We don't have any logs available for sale to your company," which was a blatant lie. With over 136 million board feet of volume under contract at the time of this conversation, Iron Triangle possessed the clear capacity to sell fir sawlogs to Prairie Wood Products, but refused to do so for the purpose of forcing the company out of business and destroying a competitor for timber harvest rights and the purchase of sawlogs within the MNF Market Area, which eliminated the

Page 21 – COMPLAINT

opportunity for loggers competing with Iron Triangle to sell logging services or sawlogs to Prairie Wood. In this circumstance, when a monopolist holding overwhelmingly dominant market power is refusing to deal with a qualified customer for the purpose of maintaining or extending its monopoly, that refusal to deal is, under U.S. Supreme Court precedent, a violation of the antitrust laws.

### LESSONS FROM A SAD CHAPTER IN FOREST SERVICE HISTORY WENT UNHEEDED IN THE DECISION TO AWARD A 10-YEAR FOREST STEWARDSHIP CONTRACT THAT INCLUDED 70% OF THE ANNUAL TIMBER SALE PROGRAM.

59.    If the Forest Service had examined its history of timber sale contracting on national forests in the West before deciding to offer a 10-year stewardship contract granting 70% of the annual timber harvest on the Malheur National Forest to a single firm, the agency would never have seriously considered this option. The economic debacle that unfolded after the Forest Service awarded 50-year supply contracts committing two-thirds of the annual harvest on the Tongass National Forest to just two companies that agreed to construct pulp plants in southeast Alaska should have been lesson enough.

60.    In the mid-1950s, the Forest Service entered into 50-year supply guarantees to two companies that each agreed to construct a pulp manufacturing facility, with one company entitled to two-thirds of the annual timber harvest on the north half of the Tongass National Forest and the other receiving an identical share of the harvest on the south half. The impact of these one-of-a-kind supply contracts on the economic health of the timber industry in southeast Alaska is instructive on two fronts.

61.    First, any government grant of substantial market power in a geographically distinct logging industry market area is extraordinarily dangerous because history shows that it is very difficult for the corporate recipients of a government-sanctioned monopoly to resist the

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

impulse to grow it and maintain it and to expand it into related markets. Second, the parallels between what happened in southeast Alaska in the 1960s and 70s and what is happening now in the Malheur National Forest Market Area are remarkable and provide helpful context to assess the aggressive combination of anticompetitive tactics deployed by Iron Triangle over the last nine years.

62.    The economic disaster caused by the Forest Service's experiment with 50-year supply contracts is chronicled in the antitrust case it generated in federal court in Washington in *Reid Bros. Logging Company v. Ketchikan Pulp Company*, 1981 WL 2124 (W. D. Wash.) and the Ninth Circuit opinion affirming a $10.5 million judgment in favor of over a dozen Alaska logging companies, *Reid Bros. Logging Company v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983). Additional detail is contained in the 1999 book authored by *Oregonian* investigative journalist Kathie Durbin entitled: *Tongass, Pulp Politics and the Fight for the Alaska Rain Forest*.

63.    There are striking similarities between what happened in the 1960s and 70s on the Tongass National Forest and what has happened and continues to evolve in the MNF Market Area. Iron Triangle has deployed a monopolization strategy similar to that of two large companies, Ketchikan Pulp Company ("KPC") and Alaska Lumber and Pulp Co. ("ALP") which began with exclusive long-term raw material supply contracts tying up two-thirds of the timber sold annually on the Tongass National Forest, which contained 97% of all forestland in southeast Alaska. Once armed with a government grant of such a sizable share of the annual timber harvest program, the two companies first agreed not the bid against each other and then used acquisitions, internal growth and predatory bidding practices to acquire monopoly power over

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

three of the same markets that Iron Triangle has monopolized or monopsonized:  the Harvest

Rights Market, the Logging Services Market and the Softwood Sawlog Market.

64.    The KPC/ALP conspiracy, which the Ninth Circuit characterized as aiming "its

tentacles at the timberland of the Tongass National Forest in Southeast Alaska," involved all of

the same markets that Iron Triangle now controls except the Stewardship Services Market.

Seattle-based District Court Judge Barbara Rothstein described those markets as the "purchase

and sale of standing timber," the purchase and sale of logs "as distinguished from standing

timber," and the purchase and sale of logging services. The fourth market in *Reid Bros.* was

described as the "market for the milling and processing of logs," which Iron Triangle entered in

2018 with its purchase of a post and pole facility handling small logs. It is worth noting that the

separate Stewardship Services Market was not involved in *Reid Bros.* because no such market

existed at the time. The Forest Service's use of stewardship contracts, which combines the

purchase of forest stewardship services with the sale of valuable saw timber is  relatively new,

first developed for the National Forest System in 2008.

65.    Just like Iron Triangle in the last decade, KPC and ALP utilized a similar mix of

interlocking anticompetitive tactics over approximately 10 years from the mid-1960s through the

mid-1970s to achieve overwhelming market power in multiple timber industry markets.

66.    The parallels in anticompetitive tactics between KPC/ALP and Iron Triangle

include the following: (1) predatory or preclusive bidding practices; (2) tying arrangements

designed to foreclose markets to new entrants; (3) false representations to the Forest Service and

powerful politicians; (4) refusals to deal; and (5) deliberately cultivating a reputation for ruthless

anticompetitive leadership as an aid to discouraging potential competition. The synergistic

character of defendants' anticompetitive tactics drew the following observation from Judge

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Rothstein: "Each part of defendants' combination and conspiracy interlocked with every other part, and was aimed at the same goal of restricting and eliminating competition in the timber industry in Southeast Alaska."

67.    **Predatory Bidding**. In 1966, the City of Petersburg, after expressions of interest from plywood companies, asked the Forest Service to put up a large timber sale that could support the establishment of a green veneer mill in the Petersburg area. The Forest Service offered a massive timber sale with an estimated volume of 264 million board feet, the largest ever offered on the Tongass National Forest. Using a front company, KPC and ALP outbid the plywood companies, which included Oregon's worker-owned plywood cooperative Astoria Plywood Corporation, by such a large bid premium that the pulp companies were certain to lose money. Those losses were more than offset by the low rates paid for the guaranteed log volume under the two companies' long-term supply contracts. This is the same tactic utilized by Iron Triangle in submitting predatory sealed bids on four timber sales in 2019 and 2021 as alleged above.

68.    **Refusals to Deal**. Having been outbid by the KPC/ALP front company, the plywood companies tried to negotiate log supply contracts for veneer quality logs. KPC's timber manager met with the plywood companies (potential new market entrants) and rejected their requests, claiming that there were "possible shortages of timber in the area and that there would not be enough timber to go around if they came in." In refusing to deal with Prairie Wood Products, Iron Triangle is making a different but similarly false excuse for irrationally continuing to sell logs at a much lower profit margin to an out of area mill.

69.    **Tying Arrangements**. KPC/ALP used tying arrangements to advance their monopolization scheme. One tied the pulp mills' willingness to buy the pulp logs on a timber sale

Page 25 – COMPLAINT

purchased by a logger to the condition that the logger sell all of its logs to the pulp mills. This put the small sawmill competitors of KPC/ALP in an untenable position because a lumber producer had no use for pulp logs and could not afford to buy them or resell them to the pulp mills, which either refused to buy them or refused to pay a competitive price.

70.    In a second tying arrangement, KPC and ALP systematically lowered the rates paid to loggers to the point where the loggers were reduced to economic bondage through the combination of below-market logging rates that then forced the loggers to obtain loans from the pulp companies to enable them to stay in business and buy new equipment. Once this arrangement was in place, KPC and ALP tied or conditioned their loan payment terms on the logger's commitment to sell all of its log production (both sawlogs and pulp logs) to the two defendants, thus foreclosing the sawlog market to competitors that were either put out of business or acquired by KPC/ALP. In the Ninth Circuit opinion in *Reid Bros.*, Judge Tuttle described the economic capture of Alaska loggers by KPC and ALP as follows:

> By calculating payments to loggers on the basis of the loggers' costs rather than the value of the logs, ALP and KPC created a network of "captive" loggers heavily indebted to the defendants.  With a drop of the executioner's sword, the defendants could cut off a logger's financing, force the logger out of business, and acquire the company or its assets.

71.    **False Representations**. As KPC and ALP successfully drove their competition for Tongass National Forest timber sales out of business (independent sawmills and loggers), the companies also obtained the market power to drive down the stumpage rates for the timber obtained under both their 50-year supply contracts and the one third of the timber sale program that was competitively bid. As their profits soared, both companies developed falsified accounting tricks to hide the profit levels that otherwise would have been reported in publicly filed financial reports. At that point, KPC was a subsidiary of publicly traded Georgia-Pacific

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Corporation. In 1972, pursuant to an antitrust settlement with the U.S. Department of Justice, KPC was spun out of Georgia-Pacific as a part of what became Louisiana-Pacific Corporation. As KPC timber manager Art Brooks acknowledged in the 1969 memorandum, "We are deterred from establishing a realistic log price by our fear that it will be reflected in the Forest Service stumpage rates."

72.     **Ruthlessly Anticompetitive Leadership**. At the center of KPC's drive to eliminate its competition was Harry Merlo, a flamboyant top executive at Georgia-Pacific and later president and CEO of Louisiana-Pacific. Under the leadership of Merlo, who was characterized as a ruthless "jungle fighter," the pace of the pulp companies' consolidation of the timber industry in southeast Alaska picked up considerably. When profits soared, Merlo ordered a falsified pulp log pricing scheme that artificially increased the cost of pulp logs to virtually eliminate KPC's profit. When lead engineer Roland Stanton questioned the directive in a meeting of top executives, saying "No one else in the business keeps books this way," he was subsequently called to a closed-door meeting and asked to resign. When he asked why, the answer was, "You are not a team player." When he refused, Stanton was fired.

73.     Iron Triangle President and CEO Russell Young shares many of the characteristics of Harry Merlo. He regularly refers to himself as the "alpha male" and insists on absolute loyalty from his employees. When an employee has done something that Mr. Young considers inappropriate or is considering leaving the company, Young refers to the Iron Triangle companies as a "Wolfpack" led by an alpha male who cannot tolerate "lone wolves." In fact, any employee who gives notice that he or she is going to work for a competitor is told that that competitor will inevitably be run out of business and, when that occurs, the departing employee will never be offered the opportunity to work for Iron Triangle again.

Page 27 – COMPLAINT

74.    The level of loyalty insisted upon by Russell Young is extraordinary. Employees and contractors are all required to purchase their gasoline or diesel from Mr. Young's fuel company in John Day. Employees are also prohibited from providing any sort of assistance to a competitor. The extraordinary reach of this rule is reflected in the following episode. An employee whose father-in-law owns a small construction company that bid successfully on a small sidewalk construction project for the City of John Day helped his father-in-law after hours with some of the work on that project. Iron Triangle also bids on municipal construction projects in John Day.  When Mr. Young learned of this fact, the employee was summoned to his office and told that he would be fired if he ever provided any assistance of any kind to his father-in-law's small construction business in the future.

75.    Since Prairie Wood Products reopened its sawmill on July 11, 2022, Mr. Young has told at least two witnesses that he was furious over the fact that Prairie Wood Products CEO Jodi Westbrooks failed to meet with him before reopening. Russell Young reportedly stated, "Who does she think she is? No one asked me if Prairie Wood could start up."

76.    In another example of Iron Triangle's pervasive anticompetitive focus, an employee of Iron Triangle's post and pole plant who was leaving to start work for Prairie Wood Products was threatened by its manager Zach Williams, who stated: "We're going to shut them down before they start. We're not going to let them get a single log." Further, he threatened the employee that, once Prairie Wood was out of business, the employee would never be rehired by Iron Triangle.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

## IN SUCCESSFULLY SELLING A FALSE NARRATIVE, IRON TRIANGLE HAS HIJACKED MALHEUR NATIONAL FOREST STEWARDSHIP CONTRACTING EXCLUSIVELY FOR ITS OWN BENEFIT

77.     The goals and objectives of stewardship contracting, as set out in a 65-page

chapter of the Forest Service Handbook, are laudable and fully supported by the plaintiff

Coalition in this case. Those policy objectives include the following:

> The general purpose of stewardship contracting is to achieve land management goals for National Forests System lands while meeting local and rural community needs.

> The intent of stewardship contracting is to accomplish resource management with a focus on restoration.

> Collaboration must be a part of stewardship contracting project planning and continue throughout the life of the project.

> Best value… must be the basis for evaluating proposals for award and stewardship contracts and agreements.

78.     Unfortunately, utilizing the broad range of anticompetitive tactics described above

and summarized below, Iron Triangle has, over the last nine years, systematically appropriated

for its own benefit virtually all of the economic benefits of stewardship contracting on the

Malheur National Forest to the considerable detriment of the local community that the 10-year

stewardship contract was supposed to support.

79.     The actions of Iron Triangle to subvert the policy objectives of stewardship

contracting by the Forest Service include the following:

> a. Eliminating the participation of forest stewardship services and logging contractors in contract performance while continuing to represent publicly that Iron Triangle was using these contractors;

> b. Engaging in predatory bidding on MNF timber sales and short-term stewardship contracts in order to foreclose competitors from the Stewardship Services and Harvest Rights markets in the MNF Market Area;

Page 29 – COMPLAINT

      c. Imposing an illegal tying arrangement on the only purchaser of pine sawlogs in the MNF Market Area for the purpose of foreclosing the Stewardship Services, Harvest Rights and Softwood Sawlog markets in the MNF Market Area to private landowners and loggers; and

      d. Refusing to sell fir sawlogs to Prairie Wood Products for the purpose of forcing the company out of business before the bidding for a second 10-year Forest stewardship contract scheduled in March 2023.

80.     It is important to note that, in refusing to sell fir sawlogs to Prairie Wood Products, Iron Triangle is blatantly violating a core commitment in its bid proposal for the 10-year stewardship contract awarded by the Forest Service in 2013. In its bid proposal, Iron Triangle committed to performing the 10-year stewardship contract in a manner that emphasized "forest products processing in the local community," which was defined as Grant and Harney counties. Hauling an estimated 20 truckloads of fir sawlogs per day past the Prairie Wood Products manufacturing plant in Prairie City over 140 miles north to a plywood plant in Elgin in Union County is fundamentally inconsistent with both the letter and spirit of the 10-year stewardship contract.

81.     Iron Triangle's anticompetitive conduct over the last nine years was not only designed to acquire and grow monopoly or monopsony power over four markets in the MNF Market Area, but to make certain that Iron Triangle was the only viable bidder for the 10-year forest stewardship contract in March 2023, thus giving the Forest Service no choice but to award that contract to Iron Triangle, enabling it to secure at least another decade of monopoly power over the four markets described above.

82.     With respect to the upcoming bidding on the next 10-year stewardship contract in March 2023, Iron Triangle's strategy is not only designed to clear the field of any potentially viable bidder, but to set the stage for supra-competitive forest stewardship service rates. Under the Forest Service regulations and handbook guidelines, the award of a stewardship contract

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

must be based upon a "best value" evaluation of competing proposals.  The best value evaluation

process is based on price and non-price criteria. Evaluation factors include past performance,

work quality, experience and benefits to the local community.

83.    However, the cost/price advantage to the Forest Service does not come into play

in awarding the contract unless the technical proposals emphasizing past performance, work

quality, experience and community benefits are determined to be "substantially equal."

84.    Iron Triangle's obvious strategy in its predatory bidding over the last three years

and its determined effort to drive Prairie Wood Products out of business in the next few months

is to clear the field of potential competitors for the 2023 10-year stewardship contract based upon

the technical proposals emphasizing past performance, work quality and experience.

85.    However, the Forest Service Handbook makes clear in section 63.3 that a multi-

year long-term stewardship contract should not be considered unless it "serves the best interests

of the United States <u>by encouraging full and open competition</u> or promoting economy and

administration, performance, and operation of the agency's programs." (emphasis added)  Given

the way in which Iron Triangle has decimated free and open competition within the MNF Market

Area as alleged above, it is critically important for the Forest Service to either break up the 10-

year stewardship contract being bid in March 2023 into two or more contracts and to make

certain that free and open competition is a substantial factor in determining benefits to the local

community of Grant and Harney counties.

## INJUNCTIVE RELIEF REQUESTED AND DAMAGES INFLICTED

86.    The intervention of this Court is urgently necessary to nullify through injunctive

relief clearly unlawful conduct by Iron Triangle on three fronts:  (1) Iron Triangle's refusal to

sell Douglas fir and white fir logs to Prairie Wood, a potential competitor for the next 10-year

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

stewardship contract; (2) Iron Triangle's blatantly illegal pine sawlog tying arrangement imposed on Malheur Lumber Co.; and (3) Iron Triangle's plan to grow its monopoly power by bidding on two timber sales totaling 20 million board feet scheduled to be bid in the second half of September 2022.  Without this injunctive relief, Prairie Wood Products will be illegally deprived of the opportunity to operate its sawmill at a profit and will be forced out of business in Prairie City.  Instead of a restored competitive landscape in the MNF Market Area, the four existing monopoly and monopsony positions held by Iron Triangle will continue for at least another decade, inflicting massive economic harm on the local economy in Grant and Harney counties, a family-owned sawmill with decades of involvement in the community, independent logging companies that would otherwise flourish in a free and open competitive market and private forestland owners who will see the value of their forestlands diminished to a negative value and face enhanced fire risk through inability to manage their forestlands.

87.    Having reopened its Prairie City sawmill on July 11, 2022, Prairie Wood Products is in the midst of restoring and updating its sawmill complex and re-permitting its co-generation electrical facility, which has the capability of consuming substantial quantities of forest biomass within the Malheur National Forest Market Area that can play a major role in substantially reducing forest fire risk in the area. Prairie Wood Products intends to invest $3 million in reopening and upgrade costs by mid-2023. The company has already invested over $500,000 in a new lumber edging scanning optimizer and the retrofit of its small boiler. However, in the face of Iron Triangle's ongoing refusal to sell Douglas fir or white fir logs to this plaintiff, its monopoly position as seller of these products and its propensity for predatory bidding at upcoming timber sales, Prairie Wood Products faces the substantial risk that it will be unable to secure the two million board feet of logs per month necessary to support a one-shift operation.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

88.     As of the date of filing of this Complaint, Prairie Wood has been open for just over two months and has been able to purchase approximately 1.3 million board feet of logs, which represents a monthly average of 650,000 board feet. To ensure at least break-even operations and, depending on the state of the U.S. lumber market, which has been falling, Prairie Wood must secure an average monthly log volume of two million board feet.

89.     With 136 million board feet of volume under contract, which Forest Service appraisals show includes 40% or 54 million board feet of Douglas fir and white fir, Iron Triangle has the capacity to supply Prairie Wood with over two years of the company's raw material requirements on a one-shift operation, but Iron Triangle refuses to sell any of it stockpiled volume under contract to Prairie Wood.

90.     To prevent Iron Triangle from using its dominant monopoly power over the sale of logs in the Malheur National Forest Market Area to destroy Prairie Wood as a competitor in the markets for acquisition of timber harvest rights on public and private forestlands and the markets for sale of forest stewardship services and contract logging services, this Court must act promptly to declare Iron Triangle's illegal tying condition imposed on Malheur Lumber Co. and its refusal to deal with Prairie Wood in the sale of its monopolized sawlog volume as illegal violations of the Sherman Act and issue a preliminary injunction (i) prohibiting the illegal tying restriction imposed on Malheur lumber Co., (ii) requiring Iron Triangle to sell Douglas fir and white fir logs to Prairie Wood at nondiscriminatory prices and (iii) enjoining Iron Triangle from bidding on the two timber sales set for sealed bidding in the second half of September 2022.

91.     Further, with respect to the next 10-year Forest stewardship contract scheduled to be bid in March 2023, the Forest Service must give due consideration to the massive level of damage to free and open competition within log-related markets in the MNF Market Area caused

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

by the award of a 10-year stewardship contract in 2013 guaranteeing 70% of the annual timber harvest over 10 years to a single bidder that then leveraged that market power into the monopolization or monopsonization of four different markets within the MNF Market Area as described above. Based on the facts revealed in this Complaint, which will be fully corroborated by discovery in the coming months, and the abysmal experience of the Forest Service with long-term log supply agreements on the Tongass National Forest, the Forest Service should not only divide the upcoming next 10-year forest stewardship contract scheduled to be bid in March 2023 into two or more components, but also redefine its "best value" selection criteria to include consideration of restoring competitive conditions to the four markets that Iron Triangle currently monopolizes. Indeed, the concentration of a 70% share of the timber sale program over 10 years on the Malheur National Forest in a single stewardship contract is the root precipitating cause of the distortion of market conditions within the Malheur National Forest Market Area that facilitated Iron Triangle's monopolization of the four markets described above.

92.     In the event competitive conditions within the MNF Market Area are not restored in sufficient time for the log supply of Prairie Wood Products to reach levels sufficient to sustain the company through the winter months, which totals eight million board feet of logs for the period of January through April (which must be delivered by February 15 to cover the period of spring break-up when logging cannot be performed due to muddy conditions), Prairie Wood Products will be forced to shut down permanently. If Prairie Wood Products is forced out of business, Iron Triangle will have inflicted damages including lost profits and the complete destruction of Prairie Wood Products' business. In that event, Prairie Wood Products' damages will be proven with specificity at trial, but are currently estimated to total $35 million in lost profits and loss of total business value.

Page 34 – COMPLAINT

93.     As a result of Iron Triangle's use of multiple anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff Rude Logging LLC has suffered lost profits over the last four years totaling $1,250,000 (including reduced revenues on log sales from the Mort timber sale and Rude Logging's private forestlands of $650,000), will suffer additional lost profits of $250,000 in the year immediately preceding trial in this case and will suffer $150,000 in lost future profits per year for an estimated the three years necessary to grow its businesses back to the level of profitability these two plaintiffs would have experienced but for Iron Triangle's monopolization of the forest stewardship, purchase of timber harvest rights and sale of contract logging services markets.

94.     As a result of Iron Triangle's use of multiple anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff Engle Contracting, LLC has suffered lost profits over the last four years of $100,000 per year, will suffer additional lost profits of $100,000 in the year immediately preceding trial in this case and will suffer $75,000 in lost future profits per year for the estimated period of three years necessary to grow its business back to the level of profitability that would have been experienced but for Iron Triangle's monopolization of the forest stewardship, purchase of timber harvest rights and sale of contract logging services markets.

95.     As a result of Iron Triangle's use of multiple anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff Morris Forestry LLC has suffered lost profits over the last four years of $75,000 per year, will suffer additional lost profits of $75,000 in the year immediately preceding trial in this case and will suffer $50,000 in lost future profits per year for the estimated period of three years necessary to grow its business back to the

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

level of profitability that would have been experienced but for Iron Triangle's monopolization of the forest stewardship and sale of contract logging services markets.

96.    As a result of Iron Triangle's use of multiple anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff H Timber Contracting LLC has suffered lost profits over the last four years of $50,000 per year, will suffer additional lost profits of $50,000 in the year immediately preceding trial in this case and will suffer $30,000 in lost future profits per year for the estimated period of three years necessary to grow its business back to the level of profitability that would have been experienced but for Iron Triangle's monopolization of the forest stewardship and sale of contract logging services markets

97.    As a result of Iron Triangle's use of multiple anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiffs Doug and Darrell Emmel doing business as Emmel Brothers Ranch and Pat and Hedy Voigt doing business as Ricco Ranch have suffered lost profits in the form of forgone timber revenues on dead or dying timber that is now not marketable. These damages have been suffered over the last four years in the amount of $50,000 per year and will also be incurred in the amount of $50,000 for the year immediately preceding trial in this case in the event this Court does not take prompt action to restore competitive conditions within the markets for the sale of contract logging services and sawlogs in the MNF Market Area.

## FIRST CLAIM FOR RELIEF:

## MONOPOLIZATION

98.    Plaintiffs reallege paragraphs 1 through 97.

99.    Iron Triangle possesses monopoly power with market shares of 95% or more in the four distinct product markets that are geographically confined to the MNF Market Area as

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

alleged above. Those four product markets are the markets for Stewardship Services, Timber

Harvest Rights, Logging Services and Softwood Sawlogs.

100.    As alleged above, Iron Triangle has willfully and intentionally utilized a

synergistic combination of anticompetitive tactics to obtain overwhelmingly dominant monopoly

or monopsony power over four log-related product markets in the MNF Market Area.

101.    Each plaintiff in this action has suffered past and future damages as described

above.  Plaintiffs' single damages total an estimated $39.04 million, which are trebled under the

antitrust laws to $117 million.

102.    Plaintiffs are entitled to an award of attorney's fees and costs.

103.    Plaintiffs are entitled to an award of prejudgment interest on all damages that

predate the filing of this Complaint.

WHEREFORE, plaintiffs pray for the following:

1.    Temporary, preliminary and permanent injunctive relief to reestablish competitive conditions in four log-related markets in the Malheur National Forest Market Area;

2.    Judgment on their Sherman Act and Clayton Act antitrust claims against defendants, jointly and severally, for treble damages in the approximate amount of $117 million;

3.    An award of plaintiffs' reasonable attorney's fees and costs;

4.    An award of prejudgment interest on all damages predating the filing of this Complaint; and

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

5.      Such other relief that the Court deems appropriate.

DATED this 15th day of September, 2022.

HAGLUND KELLEY LLP

By:  *s/ Michael E. Haglund*
Michael E. Haglund, OSB No. 772030
Christopher Lundberg, OSB No. 941084
Eric J. Brickenstein, OSB No. 142852
Christopher T. Griffith, OSB No. 154664

Attorneys for Plaintiffs

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201