**Michael E. Haglund**, OSB No. 772030
Email: mhaglund@hk-law.com
**Eric J. Brickenstein**, OSB No. 142852
Email: ebrickenstein@hk-law.com
**Christopher T. Griffith**, OSB No.
154664 Email: cgriffith@hk-law.com
**HAGLUND KELLEY LLP**
2177 SW Broadway
Portland, OR  97201
Phone:  (503) 225-0777
Facsimile:  (503) 225-1257

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT DISTRICT OF OREGON
### (Pendleton Division)

| | |
|---|---|
| **MALHEUR FOREST FAIRNESS COALITION,** an unincorporated association; **PRAIRIE WOOD PRODUCTS, LLC**, an Oregon limited liability company**; RUDE LOGGING LLC**, an Oregon limited liability company; **BRETT MORRIS,** an individual; **MORRIS FORESTRY LLC**, an Oregon limited liability company; **ENGLE CONTRACTING, LLC,** an Oregon limited liability company; **H TIMBER CONTRACTING LLC**, an Oregon limited liability company; **DOUG and DARRELL EMMEL**, doing business as **EMMEL BROTHERS RANCH**; and **PAT and HEDY VOIGT**, doing business as **RICCO RANCH**, Plaintiffs, v. **IRON TRIANGLE, LLC**, an Oregon limited liability company; **I.T. LOGGING, INC.** an Oregon corporation; **RUSSELL YOUNG**, an individual, and **OCHOCO LUMBER COMPANY d/b/a MALHEUR LUMBER COMPANY**, an Oregon limited partnership, Defendants. | Case No. 2:22-cv-01396-HZ **FIRST AMENDED COMPLAINT** **(DEMAND FOR JURY TRIAL)** |

## INTRODUCTION

1.      This is an action under the federal antitrust laws, the Sherman Act and the

Clayton Act, which prohibit monopolization in any segment of U.S. commerce. In just over

nine years, defendants Iron Triangle LLC, I.T. Logging Inc. and their owner Russell Young

(collectively, "Iron Triangle") have aggressively deployed a complex scheme that has

delivered dominant monopoly and monopsony positions to defendants in four markets in a

geographically distinct market area consisting of the Malheur National Forest and private

forestlands in Grant County and the northern third of Harney County, Oregon (hereafter, the

"MNF Market Area"). As explained in detail below, Iron Triangle, in combination with its

co-conspirator Ochoco Lumber Company d/b/a Malheur Lumber Company ("Malheur

Lumber") has ruthlessly wielded its dominance of these markets to stunt economic

development in Grant and Harney counties while coopting enormous federal resources

intended to develop and sustain the region's timber sector.

2.      The four relevant antitrust markets in which Iron Triangle holds a monopoly

(seller power) or monopsony (buyer power) in the MNF Market Area are the following: (1) as

a seller in the market for forest stewardship services such as precommercial thinning, road

maintenance and fire risk reduction projects on the Malheur National Forest (the

"Stewardship Services Market"); (2) as a buyer in the market for timber harvest rights from

public and private forestland owners (the "Harvest Rights Market"); (3) as a seller in the

market for contract logging services (the "Logging Services Market"); and (4) as a seller in

the market for softwood sawlogs (the "Softwood Sawlog Market"). In each of these markets,

Iron Triangle holds a stunning market share of at least 90%. While economically distinct, each

of the four markets that Iron Triangle dominates constitutes a key interrelated component of

Page 1 – FIRST AMENDED COMPLAINT

what can be characterized broadly as the Grant and Harney County forestry and timber sector. Iron Triangle's power in each market cross pollinates, and the application of anticompetitive tactics in one market is often critical to maintaining Iron Triangle's monopoly in another.

3.      To understand how Iron Triangle maintains its grip on this region's timber-dependent economy, it is necessary to first understand the history of how Iron Triangle achieved dominance. In 2012, the U.S. Forest Service solicited bids for an unprecedented 10-year forest stewardship contract on the Malheur National Forest. The stewardship contract's objective was to revive the local timber industry by guarantying sustainable harvest consistent with sound conservation principles, while also promoting the health of the forest through management practices such as pre-commercial thinning. The massive $69 million contract included, among other things, the first option to acquire an unheard-of 70% share of the timber harvest on the Malheur National Forest.

4.      In 2013, Iron Triangle was awarded the entire contract based on its promises to maximize the contract's economic benefits within the contractually defined "local community" of Grant and Harney counties, and to utilize local loggers (including plaintiffs Rude Logging, LLC; Morris Forestry LLC; and Engle Contracting, LLC) to perform contract logging and stewardship services. Put simply, Iron Triangle won the stewardship contract by assuring the Forest Service in its written proposal that it would administer the contract in a manner that diversified the local economy and promoted the public interest. Once the contract was secured, however, Iron Triangle did the exact opposite.

5.      Rather than perform its responsibilities under the stewardship contract in a manner consistent with its promises and the public interest, Iron Triangle promptly began leveraging its newly minted monopoly in the Harvest Rights Market to crush competition and

Page 2 – FIRST AMENDED COMPLAINT

assert its dominance in the adjacent Stewardship Services, Logging Services and Softwood Sawlog Markets.

6.      During the past decade, Iron Triangle has exploited the stewardship contract to hoard enormous volumes of forestland timber under contract. This practice – which Iron Triangle has maintained through the use of performance extensions obtained from the Forest Service based on blatant misrepresentations regarding its logging capacity – has the dual anticompetitive purpose of restricting softwood sawlog output (and thereby raising prices to supra-competitive levels) while simultaneously weakening Iron Triangle's competitors by starving them of public contract logging and stewardship opportunities in the MNF Market Area.

7.      Iron Triangle buttresses this exclusionary tactic through a truly diabolical tying arrangement that it has entered into in combination with John Day's only sawmill, co-conspirator Malheur Lumber. Under this arrangement, Iron Triangle has agreed to supply all of Malheur Lumber's sawlog requirements.  In exchange, Malheur Lumber agreed to refuse to purchase softwood sawlogs and contract logging services from Iron Triangle's competitors in the MNF Market Area. Incredibly, this illegal combination to foreclose Iron Triangle's competitors ability to sell pine sawlogs within the MNF Market Area is enforced through a contract that allows Iron Triangle to directly oversee and manage Malheur Lumber's log yard.

8.      In part because an open and continuing refusal by Malheur Lumber to purchase sawlogs or contract logging services from Iron Triangle's competitors within the MNF Market Area would raise immediate antitrust suspicion, Malheur Lumber instead accomplishes the same end by either telling prospective pine sawlog sellers that it does not need any sawlogs at the time of the inquiry or offering to purchase sawlogs at prices that are uneconomical to

Page 3 – FIRST AMENDED COMPLAINT

contract loggers and private landowners while at the same time privately paying Iron Triangle much higher prices for sawlogs harvested from the Malheur National Forest. This tactic has multiple insidious effects. First, by making logging on private lands uneconomical, Iron Triangle further restricts sawlog output and thereby strengthens its ability to charge supra-competitive prices. (Ironically, while Iron Triangle was awarded the stewardship contract in part to reduce fire risk on public lands, its exploitation of that contract has in fact *raised* fire risk by stifling private timberland harvest.) Second, because the Forest Service considers Malheur Lumber's published log prices in appraising the value of its stewardship-based timber sales, Iron Triangle is able to acquire these sawlogs as part of its stewardship contract at artificially depressed prices, further strengthening its ability to exclude rivals and extract monopoly profits.

9.      On July 11, 2022, Prairie Wood Products, LLC ("Prairie Wood") reopened its Prairie City mill – originally founded in 1977 – following a 2009 shutdown brought on by the Great Recession. Consistent with its historic focus, Prairie Wood manufactures structural dimension lumber (2 x 4s and 2 x 6s) primarily from Douglas fir and white fir logs sourced from the MNF Market Area. The reopening of Prairie Wood's stud mill – which currently employs 43 local workers in family wage jobs – should represent a major victory for the local economy and a testament to the success of Forest Service's collaborative forest stewardship program. As U.S. Senator Ron Wyden stated in celebration of the mill's reopening:

> The well-being of Oregon's signature forest products industry is a must, both to generate rural private-sector jobs and to protect our public lands from wildfires threatening communities throughout our state....... I welcome today's announcement
> both for Grant County and the collaborative efforts I have long championed that provide opportunities for local jobs and healthy landscapes.

Page 4 – FIRST AMENDED COMPLAINT

The significant achievement of Prairie Wood's reopening, however, is currently at extreme risk of being snuffed out within a matter of months by Iron Triangle's anticompetitive scheme.

10.    Ordinarily, a competitive log seller in the MNF Market Area would welcome market entry by a local buyer like Prairie Wood Products because this new local log sales outlet dramatically improves both efficiency by reducing transportation costs and profits. Iron Triangle, however, initially outright refused to sell Prairie Wood any softwood sawlogs whatsoever despite controlling more than 95% of supply. Instead, Iron Triangle routinely hauled logs *directly past* Prairie Wood Products' mill to distant mills outside the MNF Market Area in Elgin, Pilot Rock and La Grande. The only plausible motive for Iron Triangle's otherwise inexplicable refusal to deal with Prairie Wood in favor of uneconomically shipping logs outside the MNF Market Area is its determination to eliminate the perceived threat that a thriving Prairie Wood presents to Iron Triangle's monopsonies in the Harvest Rights Market and Logging Services Market and, in particular, as a potential bidder on the renewal of the 10-year stewardship contract scheduled to be bid in March 2023. Although Iron Triangle has sold Prairie Wood Products a limited supply of logs in response to the filing of this lawsuit, given the breadth of Iron Triangle's monopolistic conduct and clear anticompetitive intent, there is a serious threat that Iron Triangle will immediately revert to refusing to deal with Prairie Wood unless an injunction prohibiting that refusal issues in this case.

11.    Plaintiffs expect that Iron Triangle will falsely claim that its ability to sell to Prairie Wood is limited because its sawlogs are "spoken for" – i.e., committed by contract to other mills outside the MNF Market Area. Any such claim is belied, by the 126 million board feet of forestland timber rights that Iron Triangle has stockpiled under contract, which

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

represents more than two years of the log volume requirements of its customers.  Simply put, the only barrier to Iron Triangle selling softwood logs is its desire to maintain its monopoly/monopsony power by restricting sawlog output, curtailing its rivals contract logging opportunities and eliminating Prairie Wood as a potential competitor in Grant and Harney counties.

12.    At the same time, Malheur Lumber, pursuant to its illegal tying arrangement with Iron Triangle, refused to *buy* pine sawlogs from Prairie Wood. This is significant because unlike Malheur Lumber, Prairie Wood mills primarily fir species. By conspiring to deny Prairie Wood a market for pine, Iron Triangle and Malheur Lumber severely restrict Prairie Wood's ability to bid competitively on timber sales that contain a mix of both species and thereby maintain Iron Triangle's monopoly in the Harvest Rights Market.

13.    Throughout the past decade, Iron Triangle has successfully exploited the Forest Service's government grant of market power through the 10-year stewardship contract to weaken and exclude its rivals while consolidating federal resources intended to create economic development opportunities for the broader community in its own coffers. Iron Triangle has been so effective in this regard that it has received more than three times the contract's $69 million allocation in revenue and resources obtained from the Forest Service. Iron Triangle has used this windfall, in turn, to bid timber sales that occur outside the stewardship context at predatory levels, depriving its competitors of a source of sawlogs, and further consolidating its stranglehold on the Harvest Rights and Softwood Sawlog Markets.

14.    The current 10-year stewardship contract is now in its final year and is expected to be rebid for renewal in the third quarter of 2023. Iron Triangle's continued dominance of each of the four timber sector markets in the MNF Market Area is dependent

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

on its ability to retain exclusive control of a renewed stewardship contract. That outcome, in turn, depends on Iron Triangle's ability to crush viable alternative bidders including Prairie Wood. Thus, to maintain its monopoly and monopsony positions, Iron Triangle is willing to go to extraordinary lengths, up to and including starving Prairie Wood of sawlogs and jeopardizing the livelihoods of its 43 employees. Sadly, Iron Triangle's brutal exclusion of its rivals directly undermines the intended community benefits that are at the heart of the stewardship program that Iron Triangle, with the aid of its co-conspirator Malheur Lumber has entirely appropriated to its own private gain.

15.    There is no question that the public servants at the Forest Service and elected officials including Senator Wyden who have vigorously supported the forest stewardship program have only the best intentions and are motivated by a sincere desire to promote a vibrant and competitive timber economy. But the 2013 decision to award Iron Triangle 100% of the 10- year stewardship created conditions that have enabled a bad actor to secure overwhelmingly dominant monopolies in four markets and, of course, the immense profits that flow from the systematic exclusion of its rivals.

16.    The upcoming expiration and anticipated renewal of the stewardship contract presents a critical (and singular) opportunity to break Iron Triangle's grip and restore competitive conditions to the economically vital timber sector in the MNF Market Area. But that can only be achieved if Iron Triangle is stopped from emasculating its potential rivals by depriving them of commerce, thereby driving them from the market or sufficiently weakening these competitors so as to preclude their meaningful participation in the bidding process.

17.    With bidding on a new stewardship contract set to occur in the third quarter of 2023, it is imperative that two of Iron Triangle's most egregious anticompetitive tactics,

Page 7 – FIRST AMENDED COMPLAINT

namely its refusal to sell softwood sawlogs to Prairie Wood and the tying arrangement entered into with its co-conspirator Malheur Lumber – both of which are illegal – should be promptly enjoined.

18.     The massive scope of Iron Triangle's monopolization scheme, which now holds an iron grip on all of the forestry sector economic opportunities in the MNF Market Area except sawlog manufacturing, has generated no less than four sets of victims. These include imposing ongoing losses on the recently reopened Prairie Wood Products sawmill, foreclosing contract loggers from the Stewardship Services, Harvest Rights and Logging Services Markets, rendering the forestlands of private landowners both wildfire prone and effectively valueless and substantially increasing the wildfire risk to the citizens of Grant and Harney counties due to lack of fire risk reduction treatments on private forestland.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the federal antitrust claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.  Venue in this district is proper under 28 U.S.C. § 1391, as the defendants transact business and maintain offices within this district, and a substantial part of the events giving rise to plaintiffs' claims occurred within this district.

## PARTIES

20.     Plaintiff Malheur Forest Fairness Coalition is an unincorporated association of the plaintiffs in this case and members of the Grant and Harney County communities interested in restoring free and open competition within the forest products industry in the MNF Market Area that is an important component of the local economy.

Page 8 – FIRST AMENDED COMPLAINT

21.     Plaintiff Prairie Wood Products, LLC is an Oregon limited liability company headquartered in Prairie City, Oregon that has been owned by the DR Johnson family since 1977. Until the Great Recession forced its closure in 2009, the Johnson family's predecessor company, Prairie Wood Products, Inc., operated a sawmill producing structural lumber and a co- generation plant that employed over 100 workers on two shifts for over 30 years. The sawmill was reopened on July 11, 2022 and currently employs 43 workers in family-wage jobs on one shift.  The cogeneration facility, which is in the process of being re-permitted, operated for over 20 years at close to its 9.5 megawatt turbine capacity. This plant has the potential to play an important role in the forest restoration work within the MNF Market Area by utilizing 70,000 tons per day of non-merchantable forest biomass, which equates to the equivalent of 21 semi- truck loads per day. A 1986 photograph of the Prairie Wood Products manufacturing complex, which remains intact, is attached as Exhibit A.  Processed forest biomass and the cogeneration facility can be seen in the lower right-hand portion of the photo.

22.     Plaintiff Rude Logging LLC is an Oregon limited liability company engaged in the business of purchasing public timber sales, providing contract logging services and fighting wildfires. The company is headquartered in John Day, Oregon and employs 23 workers.

23.     Plaintiff Brett Morris owned and operated Morris Forestry as a sole properitorship providing contract logging services before registering the plaintiff Morris Forestry LLC, an Oregon limited liability company, in March 2020.  The company is headquartered in John Day, Oregon and employs three workers.

24.     Plaintiff Engle Contracting, LLC is an Oregon limited liability company engaged in the business of purchasing public timber sales, providing contract logging

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

services, forest stewardship contract services and fighting forest fires. The company is headquartered in Monument, Oregon and employs four workers.

25.     Plaintiff H Timber Contracting LLC is an Oregon limited liability company engaged in the business of providing contract logging services. The company is headquartered in Burns, Oregon and employs three workers.

26.     Plaintiffs Doug and Darrell Emmel are the owners of a 4,000-acre ranch near John Day, Oregon that does business as Emmel Brothers Ranch. The ranch owns approximately 2,000 acres of productive forestland.  Plaintiffs Patrick and Hedy Voigt are the owners of an 8,500-acre ranch near John Day, Oregon that does business as Ricco Ranch.  The ranch owns nearly 4,000 acres of productive forestland.

27.     Defendant Ochoco Lumber Company d/b/a Malheur Lumber Company is an Oregon limited partnership headquartered in Prineville, Oregon engaged in the business of owning and operating a sawmill located in John Day, Oregon.

28.     Defendant Iron Triangle, LLC is an Oregon limited liability company headquartered in John Day, Oregon engaged in the businesses of providing forest stewardship services, purchasing and performing public timber sale contracts, providing contract logging services and the selling of softwood sawlogs and pulp logs. Defendant I.T. Logging, Inc. is an Oregon corporation that performs one or more of the same lines of business performed by Iron Triangle, LLC. Defendant Russell Young is the sole owner of defendants Iron Triangle, LLC and I.T. Logging, Inc.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

### IRON TRIANGLE'S MONOPOLY OR MONOPSONY POWER IN FOUR RELEVANT PRODUCT MARKETS IN THE MALHEUR NATIONAL FOREST MARKET AREA.

29.    Iron Triangle possesses monopoly and/or monopsony power and currently holds at least 95% market shares in each of the following four economically distinct product markets within the MNF Market Area: (1) as a seller in the Stewardship Services Market; (2) as a buyer in the Harvest Rights Market; (3) as a seller in the Logging Services Market; and (4) as a seller in the Softwood Sawlog Market. As addressed in turn below, each of these markets experience significant barriers to entry and are geographically constrained to the MNF Market Area primarily by economic factors including transportation costs.

### The Stewardship Services Market.

30.    The Stewardship Services Market is defined as consisting of the purchase and sale of forest stewardship services including precommercial thinning, road maintenance, fire risk reduction and related services performed in the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestlands in Grant County and the northern third of Harney County.

31.    The Stewardship Service Market is characterized by high barriers to entry due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services.

32.    The Stewardship Services Market is geographically constrained to the MNF Market Area including the 1.7 million acre territorial expanse of the Malheur National Forest and the surrounding or inholding private forestlands in the MNF Market Area.  The cost and time of mobilizing and demobilizing the equipment necessary to perform the required stewardship services precludes businesses from operating over larger geographic areas.  Thus, the stewardship services that comprise this market can only be performed within the MNF

Page 11 – FIRST AMENDED COMPLAINT

Market Area, and only firms located within a reasonably accessible distance of the Malheur National Forest are capable of performing stewardship services within the MNF Market Area.

33.    Currently, Iron Triangle holds a pure monopoly in the Stewardship Services Market with a 100% market share following the Forest Service's 2013 award of a 10-year stewardship contract, its purchase of short-term stewardship contracts on the Malheur National Forest with remaining volume under contract and its foreclosure of forest stewardship opportunities on private forestland in the MNF Market Area.

**The Harvest Rights Market**.

34.    The Harvest Rights Market is defined as consisting of the acquisition and sale of the right to harvest timber in the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestlands in Grant County and the northern third of Harney County. The Harvest Rights Market is geographically constrained to the MNF Market Area by the limited distance that logs harvested pursuant to those rights can be economically transported to a manufacturing plant such as a sawmill.

35.    The Harvest Rights Market experiences high barriers to entry due in significant part to the Forest Service's award of a 10-year stewardship contract to Iron Triangle that grants it the first right of refusal to purchase harvest rights to timber located on the Malheur National Forest that comprises no less than 70% of available volume within the MNF Market Area. Further, Iron Triangle has erected artificial barriers to entry through anticompetitive tactics that include predatory bidding on public timber sales and suppressing the value of private timberland harvest rights through the tying arrangement entered into with co-conspirator Malheur Lumber.

Page 12 – FIRST AMENDED COMPLAINT

36.     Currently, Iron Triangle holds a near pure monopsony in the Harvest Rights Market with a 96.6% market share as of December 31, 2021.

**The Logging Services Market.**

37.     The Logging Services Market is defined to include the purchase and sale of contract logging services within the MNF Market Area consisting of the Malheur National Forest and the surrounding or inholding private forestland in Grant County and the northern third of Harney County. The Logging Services Market is geographically constrained to the MNF Market Area by the limited distance that contract loggers can economically haul softwood sawlogs to a manufacturer.

38.     The Logging Services Market is characterized by high barriers to entry due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services. In addition, Iron Triangle has erected artificial barriers to entry through anticompetitive tactics including the tying arrangement entered into with co-conspirator Malheur Lumber which reduces the value of private timberland and thereby distorts and suppresses the economic incentive for private landowners and contract loggers to purchase or perform contract logging services on private forestlands.

39.     Currently, Iron Triangle holds a near pure monopoly in the market for contract logging services with a more than 95% market share.

**The Softwood Sawlog Market.**

40.     The Softwood Sawlog Market is a commodity market for the purchase and sale of softwood sawlogs of the ponderosa pine, lodgepole pine, Douglas fir, white fir and larch species harvested in the MNF Market Area consisting of public and private forestlands located in Grant County and the northern half of Harney County.  The Softwood Sawlog Market is

Page 13 – FIRST AMENDED COMPLAINT

geographically constrained to the MNF Market Area by the limited distance that sawlogs can be economically transported to a manufacturer such as a sawmill.

41.     The principal barrier to entering the Softwood Sawlog Market as either a buyer or a seller is Iron Triangle's near total control of softwood sawlog supply through its dominance of the Harvest Rights Market and Logging Services Market. Currently, Iron Triangle holds a near pure monopoly in the Softwood Sawlog Market with a more than 95% market share.

## 2012-2022: IRON TRIANGLE'S WILLFUL ACQUISITION OF MONOPOLY OR MONOPSONY POWER IN FOUR MARKETS

42.     In the fall of 2013, following the award of the 10-year stewardship contract, Iron Triangle subcontracted logging services to some of the loggers identified in its bid, including plaintiffs Rude Logging LLC and Engle Contracting, LLC.  The contracts established logging service rates of $24 per ton for all logging services from "stump to truck," which included  falling, bucking, skidding and decking of logs plus loading aboard log trucks. The contracts also specified log trucking rates per ton for deliveries to the different locations of the mills purchasing the logs.

43.     One year later in October 2014, Iron Triangle presented contracts to the same group of loggers but at reduced rates that also targeted timber stands where logging was less efficient and thus more costly due to lower log quality and lower harvest volume per acre. Plaintiff Engle Contracting, LLC declined to log at such uneconomic rates. Plaintiff Rude Logging, LLC accepted the reduced contract rates and performed the 2014 contract and performed additional logging contract services for Iron Triangle in 2015 and part of 2016, but barely covered its costs with little or no profit. Rude Logging declined to accept uneconomic

Page 14 – FIRST AMENDED COMPLAINT

contract proposals from Iron Triangle in the fourth year of the 10-year stewardship contract or thereafter.

44.    In presenting uneconomic forest stewardship and logging service contracts to purchase and contract loggers in 2014 and 2015, Iron Triangle was pursuing a deliberate anti-competitive strategy to eliminate these logging companies from competing with Iron Triangle in the MNF Market Area.

45.    During the process of eliminating the participation of local loggers in the performance of forest stewardship and logging services, Iron Triangle used a pattern and practice of false representations regarding its financial performance both to Forest Service personnel administering the 10-year forest stewardship contract and to Oregon Senator Ron Wyden's office, which had a keen interest in the success of the relatively novel use of multi-year forest stewardship contracts on national forests. As a result of Iron Triangle's aggressive pressure campaign based on blatantly false misrepresentations and strong political support from Senator Wyden's office, which accepted defendants' misrepresentations as the truth, the Forest Service repeatedly approved forest stewardship service contract rates and/or subsidies to Iron Triangle at monopoly or supra-competitive rates that have, to date, more than tripled the original $69 million "not to exceed" cost of the 10-year stewardship contract.

46.    As just one example, when Iron Triangle negotiated Task Order 2 for the second year of the 10-year stewardship contract in the summer of 2014, its combination of false representations and political pressure secured through those misrepresentations resulted in shockingly high monopoly profits. Specifically, for the timber volume to be removed totaling approximately 50 million board feet, Iron Triangle was paid rates of approximately $63 per ton to harvest, remove and deliver the logs generated in the harvest to multiple

Page 15 – FIRST AMENDED COMPLAINT

manufacturers in eastern Oregon. These rates exceeded the cost of logging and trucking as
demonstrated by the significantly lower rates that Iron Triangle paid to contract loggers and
truck haulers during that second year of the stewardship contract. There is no question that the
logging and hauling rates approved by the Forest Service for Task Order 2 were supra-
competitive monopoly rates.

47.    But even more significantly from a financial perspective, the value of the 50
million board feet in authorized sawlog timber removals in Task Order 2 was negotiated by
Iron Triangle in an incredibly aggressive fashion and ultimately approved by the Forest
Service at a rate of just $0.34 per ton or, utilizing the Forest Service's standard conversion
factor of six tons per thousand board feet, $2.04 per thousand board feet ("MBF"). As of 2014,
a conservative average of the log prices being paid by the eastern Oregon sawmills and
plywood plant purchasing sawlogs from Iron Triangle was $400 per MBF. Without
considering the profits flowing from the difference between its actual logging and truck
hauling costs and the rates being paid by the Forest Service, Iron Triangle's profits on the sale
of the 50 million board feet in sawlogs alone, which were virtually given away at a price of
just over $2 per MBF and then sold for an average of $400 per MBF, was nearly $20 million
(50,000 MBF x $397.96).

48.    Armed with the inflow of monopoly profits paid by the Forest Service for
forest stewardship services billed at excessive rates for Task Order 2 performed in 2014
through 2016, Iron Triangle proceeded to consolidate its monopsony position in the market
for timber harvest rights by engaging in predatory bidding practices, outbidding competing
loggers for over 90% of the volume in open market timber sales comprising the remaining
30% of the annual timber harvest offered by the Malheur National Forest during each of the

Page 16 – FIRST AMENDED COMPLAINT

calendar years from 2016 through 2021.  In 2016 and part of 2017, Iron Triangle made it a practice at the oral ascending auctions for timber sales to continue bidding until the last competitor dropped out. During this timeframe, Iron Triangle successfully used this practice to outbid every competitor on a total of nine timber sales.

49.    When the Forest Service changed the bidding procedure in mid-2017 from oral auctions to sealed bids in an effort to foster increased competition, Iron Triangle simply redeployed a share of its monopoly profits obtained from overpriced forest stewardship services to implement aggressive, predatory sealed bids which far exceeded the second high bid in an obvious effort to eliminate competition for open market timber sales sold on the Malheur National Forest.

50.    In September 2018 and January 2019, Iron Triangle submitted sealed bids at predatory levels on the Conroy timber sale that included 23.1 million board feet and the Coxie timber sale been included 12.9 million board feet. On these two sales, Iron Triangle's bids were submitted at predatory levels in that Iron Triangle bid at a level that it knew no possible competitor would match or exceed and which imposed a loss on Iron Triangle because ita sawlog sale revenues from the timber sale fell below all of its costs for stumpage, logging and truck hauling. On the Conroy timber sale, Iron Triangle bid 2.72 times higher than the second high bidder, bidding $1,356,012 compared to the second highest bid of $496,343.  On the Coxie timber sale, Iron Triangle's bid was 1.44 times higher than the second high bid.

51.    In 2021, Iron Triangle submitted predatory bids for the Ruby timber sale that included 3.86 million board feet and the R & R timber sale that included 6.0 million board feet.  These predatory bids, both of which impose losses on Iron Triangle, were 1.56 and 1.76

Page 17 – FIRST AMENDED COMPLAINT

times the second highest bids, respectively. Plaintiff Rude Logging was one of the top unsuccessful bidders on three of the four predatorially bid timber sales described above.

      52.     By the end of 2021, Iron Triangle's preclusive bidding practices had achieved overwhelmingly dominant monopsony power over the acquisition of timber harvest rights on the Malheur National Forest, securing 13 of 14 sales of any size (volume greater than 200 MBF) in those three years and over 95% of the offered volume. A chart showing Iron Triangle's relentless march toward nearly pure monopoly power between 2011 and the beginning of 2022 is set out on the following page. This chart shows that Iron Triangle moved from holding just over 50% of the volume under contract on the Malheur National Forest in 2012 to 96.6% as of January 1, 2022. During the 11 years between December 31, 2011 and January 1, 2022, Iron Triangle more than quintupled its volume under contract from 22.3 million board feet to 128.3 million board feet at the end of 2021.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201



HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

53.     To further cement its monopsony position in the market for timber harvest rights from both public and private lands in the MNF Market Area, Iron Triangle in 2020 conspired with the only purchaser of pine sawlogs in the market area, Malheur Lumber, to restrict purchases and deny a local pine sawlog market to Iron Triangle's competitors in the MNF Market Area.  Malheur Lumber would ordinarily source pine sawlogs through three markets: acquisition of timber harvest rights from the Forest Service or private landowners, direct purchase of sawlogs from logging companies or through participation in contract logging agreements between loggers and private landowners. Wood products manufacturers engage in the contract logging market by agreeing to purchase at a specified price logs harvested under these agreements, thereby enabling such arrangements to move forward.

54.     As of the beginning of 2020, Iron Triangle had amassed a volume of timber under contract in the MNF Market Area of 95.3 million board feet at that point, which included over two years' worth of the annual pine sawlog requirements for Malheur Lumber Co. Iron Triangle and Malheur Lumber entered into an agreement whereby Malheur Lumber committed not to purchase pine sawlogs from any other logger harvesting on the Malheur National Forest, or agree to purchase pine sawlogs generated from contractual arrangements between contract loggers and private landowners in the MNF Market Area and, in exchange, Iron Triangle would be Malheur Lumber's only pine sawlog supplier from within the Malheur National Forest Market Area.  In effect, Iron Triangle tied its sale of pine sawlogs to the condition that Malheur Lumber also purchase all contract logging services within the MNF Market Area exclusively from Iron Triangle. Malheur Lumber agreed and, in combination with Iron Triangle, has jointly refused to deal with Iron Triangle's competitors in the MNF Market Area.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

55.    Since this boycott requirement applied to both the direct purchase of pine sawlogs and to acquisition of logs through the separate contract logging market, Iron Triangle and Malheur Lumber's actions constitute a *per se* illegal conspiracy in restraint of trade. Malheur Lumber Co. has furthered the conspiracy by simply refusing to purchase pine sawlogs from loggers or to participate in contract logging arrangements between contract loggers and private landowners in the MNF Market Area, or by accomplishing the same result indirectly by offering uneconomically low prices for those logs.

56.    Malheur Lumber Co.'s acts in furtherance of the conspiracy by quoting purchase prices below suppliers' costs of production confers an additional benefit on Iron Triangle.  When the Forest Service appraises either an independent timber sale or the timber included in an Iron Triangle stewardship contract, that timber is appraised based upon sale to a manufacturer in John Day, specifically Malheur Lumber Co. With the benefit of artificially low prices quoted by Malheur Lumber Co., the relevant appraisals understate the true value of the timber to the benefit of Iron Triangle.

57.    The impacts of the illegal conspiracy between Malheur Lumber and Iron Triangle have been widespread. Private landowners throughout the market area including two members of the plaintiff coalition (Doug and Darrell Emmel and Pat and Hedy Voigt) have been foreclosed from harvesting softwood sawlogs on their properties because the only available pine sawmills willing to purchase their logs are located so far away that the landowner not only receives no return, but must pay contract logging service and trucking costs that exceed the delivered log values to those mills. In addition, by rendering timber harvest on private lands uneconomic within the MNF Market Area, independent logging contractors including four members of the plaintiff coalition (Rude Logging LLC, Morris

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Forestry LLC, Engle Contracting, LLC and H Timber Contracting LLC) have been substantially foreclosed from the market for logging services within the MNF Market Area, leaving Iron Triangle standing alone as the dominant seller of contract logging services in the MNF Market Area.

58.     The combination of Iron Triangle's market power in the markets for forest stewardship services, timber harvest rights, and contract logging services has effectively foreclosed its competition from acquiring timber harvest rights or providing contract logging services to private landowners, enabling Iron Triangle to establish a monopoly position as a seller of sawlogs within the MNF Market Area.

59.     In the most recent development demonstrating Iron Triangle's absolute commitment to maintaining its four monopoly/monopsony positions, defendant refused to sell sawlogs to Prairie Wood Products, LLC, which reopened its sawmill in Prairie City on July 11, 2022, before ultimately reversing course only after the filing of this lawsuit. When it reopened, Prairie Wood Products anticipated that Iron Triangle would gladly sell Douglas fir and white fir logs harvested on the Malheur National Forest to a mill in Prairie City rather than haul those logs north over 140 miles at substantial cost to a plywood plant located outside of the MNF Market Area in Elgin, Oregon. Instead, Iron Triangle refused to do business with Prairie Wood Products in a blatant attempt to force the company out of business.

60.     Shockingly, when Prairie Wood Products timber manager Dan Bishop contacted Iron Triangle to discuss the purchase of fir sawlogs, Iron Triangle owner Russell Young stated: "We don't have any logs available for sale to your company," which was a blatant lie. With over 136 million board feet of volume under contract at the time of this conversation, Iron Triangle possessed the clear capacity to sell fir sawlogs to Prairie Wood

Page 22 – FIRST AMENDED COMPLAINT

Products, but refused to do so for the purpose of forcing the company out of business and

destroying a competitor for timber harvest rights and the purchase of sawlogs within the MNF

Market Area, which eliminated the opportunity for loggers competing with Iron Triangle to

sell logging services or sawlogs to Prairie Wood. In this circumstance, when a monopolist

holding overwhelmingly dominant market power refused to deal with a qualified customer for

the purpose of maintaining or extending its monopoly, that refusal to deal is, under U.S.

Supreme Court precedent, a violation of the antitrust laws.

**LESSONS FROM A SAD CHAPTER IN FOREST SERVICE HISTORY
WENT UNHEEDED IN THE DECISION TO AWARD A 10-YEAR FOREST
STEWARDSHIP CONTRACT THAT INCLUDED 70% OF THE ANNUAL
TIMBER SALE PROGRAM.**

61.    If the Forest Service had examined its history of timber sale contracting on

national forests in the West before deciding to offer a 10-year stewardship contract granting

70% of the annual timber harvest on the Malheur National Forest to a single firm, the agency

would never have seriously considered this option. The economic debacle that unfolded after

the Forest Service awarded 50-year supply contracts committing two-thirds of the annual

harvest on the Tongass National Forest to just two companies that agreed to construct pulp

plants in southeast Alaska should have been lesson enough.

62.    In the mid-1950s, the Forest Service entered into 50-year supply guarantees

to two companies that each agreed to construct a pulp manufacturing facility, with one

company entitled to two-thirds of the annual timber harvest on the north half of the Tongass

National Forest and the other receiving an identical share of the harvest on the south half.

The impact of these one-of-a-kind supply contracts on the economic health of the timber

industry in southeast Alaska is instructive on two fronts.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

63.     First, any government grant of substantial market power in a geographically distinct logging industry market area is extraordinarily dangerous because history shows that it is very difficult for the corporate recipients of a government-sanctioned monopoly to resist the impulse to grow it and maintain it and to expand it into related markets. Second, the parallels between what happened in southeast Alaska in the 1960s and 70s and what is happening now in the Malheur National Forest Market Area are remarkable and provide helpful context to assess the aggressive combination of anticompetitive tactics deployed by Iron Triangle over the last nine years.

64.     The economic disaster caused by the Forest Service's experiment with 50-year supply contracts is chronicled in the antitrust case it generated in federal court in Washington in *Reid Bros. Logging Company v. Ketchikan Pulp Company*, 1981 WL 2124 (W. D. Wash.) and the Ninth Circuit opinion affirming a $10.5 million judgment in favor of over a dozen Alaska logging companies, *Reid Bros. Logging Company v. Ketchikan Pulp Co*., 699 F.2d 1292 (9th Cir. 1983). Additional detail is contained in the 1999 book authored by *Oregonian* investigative journalist Kathie Durbin entitled: *Tongass, Pulp Politics and the Fight for the Alaska Rain Forest*.

65.     There are striking similarities between what happened in the 1960s and 70s on the Tongass National Forest and what has happened and continues to evolve in the MNF Market Area. Iron Triangle has deployed a monopolization strategy similar to that of two large companies, Ketchikan Pulp Company ("KPC") and Alaska Lumber and Pulp Co. ("ALP") which began with exclusive long-term raw material supply contracts tying up two-thirds of the timber sold annually on the Tongass National Forest, which contained 97% of all forestland in southeast Alaska. Once armed with a government grant of such a sizable share of the annual

Page 24 – FIRST AMENDED COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

timber harvest program, the two companies first agreed not the bid against each other and then used acquisitions, internal growth and predatory bidding practices to acquire monopoly power over three of the same markets that Iron Triangle has monopolized or monopsonized:  the Harvest Rights Market, the Logging Services Market and the Softwood Sawlog Market.

66.     The KPC/ALP conspiracy, which the Ninth Circuit characterized as aiming "its tentacles at the timberland of the Tongass National Forest in Southeast Alaska," involved all of the same markets that Iron Triangle now controls except the Stewardship Services Market. Seattle-based District Court Judge Barbara Rothstein described those markets as the "purchase and sale of standing timber," the purchase and sale of logs "as distinguished from standing timber," and the purchase and sale of logging services. The fourth market in *Reid Bros.* was described as the "market for the milling and processing of logs," which Iron Triangle entered in 2018 with its purchase of a post and pole facility handling small logs. It is worth noting that the separate Stewardship Services Market was not involved in *Reid Bros*. because no such market existed at the time. The Forest Service's use of stewardship contracts, which combines the purchase of forest stewardship services with the sale of valuable saw timber is  relatively new, first developed for the National Forest System in 2008.

67.     Just like Iron Triangle in the last decade, KPC and ALP utilized a similar mix of interlocking anticompetitive tactics over approximately 10 years from the mid-1960s through the mid-1970s to achieve overwhelming market power in multiple timber industry markets.

68.     The parallels in anticompetitive tactics between KPC/ALP and Iron Triangle include the following: (1) predatory or preclusive bidding practices; (2) tying arrangements

Page 25 – FIRST AMENDED COMPLAINT

designed to foreclose markets to new entrants; (3) false representations to the Forest Service and powerful politicians; (4) refusals to deal; and (5) deliberately cultivating a reputation for ruthless anticompetitive leadership as an aid to discouraging potential competition. The synergistic character of defendants' anticompetitive tactics drew the following observation from Judge Rothstein: "Each part of defendants' combination and conspiracy interlocked with every other part, and was aimed at the same goal of restricting and eliminating competition in the timber industry in Southeast Alaska."

69. **Predatory Bidding**. In 1966, the City of Petersburg, after expressions of interest from plywood companies, asked the Forest Service to put up a large timber sale that could support the establishment of a green veneer mill in the Petersburg area. The Forest Service offered a massive timber sale with an estimated volume of 264 million board feet, the largest ever offered on the Tongass National Forest. Using a front company, KPC and ALP outbid the plywood companies, which included Oregon's worker-owned plywood cooperative Astoria Plywood Corporation, by such a large bid premium that the pulp companies were certain to lose money. Those losses were more than offset by the low rates paid for the guaranteed log volume under the two companies' long-term supply contracts. This is the same tactic utilized by Iron Triangle in submitting predatory sealed bids on four timber sales in 2019 and 2021 as alleged above.

70. **Refusals to Deal**. Having been outbid by the KPC/ALP front company, the plywood companies tried to negotiate log supply contracts for veneer quality logs. KPC's timber manager met with the plywood companies (potential new market entrants) and rejected their requests, claiming that there were "possible shortages of timber in the area and that there would not be enough timber to go around if they came in." In refusing to deal with Prairie

Page 26 – FIRST AMENDED COMPLAINT

Wood Products, Iron Triangle is making a different but similarly false excuse for irrationally continuing to sell logs at a much lower profit margin to an out of area mill.

71.    **Tying Arrangements**. KPC/ALP used tying arrangements to advance their monopolization scheme. One tied the pulp mills' willingness to buy the pulp logs on a timber sale purchased by a logger to the condition that the logger sell all of its logs to the pulp mills. This put the small sawmill competitors of KPC/ALP in an untenable position because a lumber producer had no use for pulp logs and could not afford to buy them or resell them to the pulp mills, which either refused to buy them or refused to pay a competitive price.

72.    In a second tying arrangement, KPC and ALP systematically lowered the rates paid to loggers to the point where the loggers were reduced to economic bondage through the combination of below-market logging rates that then forced the loggers to obtain loans from the pulp companies to enable them to stay in business and buy new equipment. Once this arrangement was in place, KPC and ALP tied or conditioned their loan payment terms on the logger's commitment to sell all of its log production (both sawlogs and pulp logs) to the two defendants, thus foreclosing the sawlog market to competitors that were either put out of business or acquired by KPC/ALP. In the Ninth Circuit opinion in *Reid Bros.*, Judge Tuttle described the economic capture of Alaska loggers by KPC and ALP as follows:

> By calculating payments to loggers on the basis of the loggers' costs rather than the value of the logs, ALP and KPC created a network of "captive" loggers heavily indebted to the defendants.  With a drop of the executioner's sword, the defendants could cut off a logger's financing, force the logger out of business, and acquire the company or its assets.

73.    **False Representations**. As KPC and ALP successfully drove their competition

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

for Tongass National Forest timber sales out of business (independent sawmills and loggers), the companies also obtained the market power to drive down the stumpage rates for the timber obtained under both their 50-year supply contracts and the one third of the timber sale program that was competitively bid. As their profits soared, both companies developed falsified accounting tricks to hide the profit levels that otherwise would have been reported in publicly filed financial reports. At that point, KPC was a subsidiary of publicly traded Georgia-Pacific Corporation. In 1972, pursuant to an antitrust settlement with the U.S. Department of Justice, KPC was spun out of Georgia-Pacific as a part of what became Louisiana-Pacific Corporation. As KPC timber manager Art Brooks acknowledged in the 1969 memorandum, "We are deterred from establishing a realistic log price by our fear that it will be reflected in the Forest Service stumpage rates."

74.    **Ruthlessly Anticompetitive Leadership**. At the center of KPC's drive to eliminate its competition was Harry Merlo, a flamboyant top executive at Georgia-Pacific and later president and CEO of Louisiana-Pacific. Under the leadership of Merlo, who was characterized as a ruthless "jungle fighter," the pace of the pulp companies' consolidation of the timber industry in southeast Alaska picked up considerably. When profits soared, Merlo ordered a falsified pulp log pricing scheme that artificially increased the cost of pulp logs to virtually eliminate KPC's profit. When lead engineer Roland Stanton questioned the directive in a meeting of top executives, saying "No one else in the business keeps books this way," he was subsequently called to a closed-door meeting and asked to resign. When he asked why, the answer was, "You are not a team player." When he refused, Stanton was fired.

75.    Iron Triangle President and CEO Russell Young shares many of the characteristics of Harry Merlo. He regularly refers to himself as the "alpha male" and insists

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

on absolute loyalty from his employees. When an employee has done something that Mr.

Young considers inappropriate or is considering leaving the company, Young refers to the

Iron Triangle companies as a "Wolfpack" led by an alpha male who cannot tolerate "lone

wolves." In fact, any employee who gives notice that he or she is going to work for a

competitor is told that that competitor will inevitably be run out of business and, when that

occurs, the departing employee will never be offered the opportunity to work for Iron Triangle

again.

       76.     The level of loyalty insisted upon by Russell Young is extraordinary.

Employees and contractors are all required to purchase their gasoline or diesel from Mr.

Young's fuel company in John Day. Employees are also prohibited from providing any sort of

assistance to a competitor. The extraordinary reach of this rule is reflected in the following

episode. An employee whose father-in-law owns a small construction company that bid

successfully on a small sidewalk construction project for the City of John Day helped his

father-in-law after hours with some of the work on that project. Iron Triangle also bids on

municipal construction projects in John Day. When Mr. Young learned of this fact, the

employee was summoned to his office and told that he would be fired if he ever provided any

assistance of any kind to his father-in- law's small construction business in the future.

       77.     Since Prairie Wood Products reopened its sawmill on July 11, 2022, Mr.

Young has told at least two witnesses that he was furious over the fact that Prairie Wood

Products CEO Jodi Westbrooks failed to meet with him before reopening. Russell Young

reportedly stated, "Who does she think she is? No one asked me if Prairie Wood could start

up."

Page 29 – FIRST AMENDED COMPLAINT

78.     In another example of Iron Triangle's pervasive anticompetitive focus, an employee of Iron Triangle's post and pole plant who was leaving to start work for Prairie Wood Products was threatened by its manager Zach Williams, who stated: "We're going to shut them down before they start. We're not going to let them get a single log." Further, he threatened the employee that, once Prairie Wood was out of business, the employee would never be rehired by Iron Triangle.

### IN SUCCESSFULLY SELLING A FALSE NARRATIVE, IRON TRIANGLE HAS HIJACKED MALHEUR NATIONAL FOREST STEWARDSHIP CONTRACTING EXCLUSIVELY FOR ITS OWN BENEFIT

79.     The goals and objectives of stewardship contracting, as set out in a 65-page chapter of the Forest Service Handbook, are laudable and fully supported by the plaintiff Coalition in this case. Those policy objectives include the following:

> The general purpose of stewardship contracting is to achieve land management goals for National Forests System lands while meeting local and rural community needs.

> The intent of stewardship contracting is to accomplish resource management with a focus on restoration.

> Collaboration must be a part of stewardship contracting project planning and continue throughout the life of the project.

> Best value… must be the basis for evaluating proposals for award and stewardship contracts and agreements.

80.     Unfortunately, utilizing the broad range of anticompetitive tactics described above and summarized below, Iron Triangle has, over the last nine years, systematically appropriated for its own benefit virtually all of the economic benefits of stewardship contracting on the Malheur National Forest to the considerable detriment of the local community that the 10-year stewardship contract was supposed to support.

Page 30 – FIRST AMENDED COMPLAINT

81.    The actions of Iron Triangle to subvert the policy objectives of

stewardship contracting by the Forest Service include the following:

     a.  Eliminating the participation of forest stewardship services and logging contractors in contract performance while continuing to represent publicly that Iron Triangle was using these contractors;

     b.  Engaging in predatory bidding on MNF timber sales and short-term stewardship contracts in order to foreclose competitors from the Stewardship Services and Harvest Rights markets in the MNF Market Area;

     c.  Conspiring with the only purchaser of pine sawlogs in the MNF Market Area for the purpose of foreclosing the Stewardship Services, Harvest Rights and Softwood Sawlog markets in the MNF Market Area to private landowners and loggers; and

     d.  Refusing to sell fir sawlogs to Prairie Wood Products for the purpose of forcing the company out of business before the bidding for a second 10-year Forest stewardship contract scheduled in March 2023.

82.    It is important to note that, in refusing to sell fir sawlogs to Prairie Wood

Products, Iron Triangle is blatantly violating a core commitment in its bid proposal for the 10-

year stewardship contract awarded by the Forest Service in 2013. In its bid proposal, Iron

Triangle committed to performing the 10-year stewardship contract in a manner that

emphasized "forest products processing in the local community," which was defined as Grant

and Harney counties. Hauling an estimated 20 truckloads of fir sawlogs per day past the

Prairie Wood Products manufacturing plant in Prairie City over 140 miles north to a plywood

plant in Elgin in Union County is fundamentally inconsistent with both the letter and spirit of

the 10-year stewardship contract.

83.    Iron Triangle's anticompetitive conduct over the last nine years was not only

designed to acquire and grow monopoly or monopsony power over four markets in the MNF

Page 31 – FIRST AMENDED COMPLAINT

Market Area, but to make certain that Iron Triangle was the only viable bidder for the 10-year

forest stewardship contract in March 2023, thus giving the Forest Service no choice but to

award that contract to Iron Triangle, enabling it to secure at least another decade of monopoly

power over the four markets described above.

84.    With respect to the upcoming bidding on the next 10-year stewardship contract

in March 2023, Iron Triangle's strategy is not only designed to clear the field of any

potentially viable bidder, but to set the stage for supra-competitive forest stewardship service

rates. Under the Forest Service regulations and handbook guidelines, the award of a

stewardship contract must be based upon a "best value" evaluation of competing proposals.

The best value evaluation process is based on price and non-price criteria. Evaluation factors

include past performance, work quality, experience and benefits to the local community.

85.    However, the cost/price advantage to the Forest Service does not come into

play in awarding the contract unless the technical proposals emphasizing past performance,

work quality, experience and community benefits are determined to be "substantially equal."

86.    Iron Triangle's obvious strategy in its predatory bidding over the last three

years and its determined effort to drive Prairie Wood Products out of business in the next few

months  is to clear the field of potential competitors for the 2023 10-year stewardship contract

based upon the technical proposals emphasizing past performance, work quality and

experience.

87.    However, the Forest Service Handbook makes clear in section 63.3 that a multi-

year long-term stewardship contract should not be considered unless it "serves the best interests

of the United States by encouraging full and open competition or promoting economy and

administration, performance, and operation of the agency's programs." (emphasis added) Given

Page 32 – FIRST AMENDED COMPLAINT

the way in which Iron Triangle has decimated free and open competition within the MNF Market
Area as alleged above, it is critically important for the Forest Service to either break up the 10-
year stewardship contract being bid in March 2023 into two or more contracts and to make
certain that free and open competition is a substantial factor in determining benefits to the local
community of Grant and Harney counties.

## INJUNCTIVE RELIEF REQUESTED AND DAMAGES INFLICTED

88.     The intervention of this Court is urgently necessary to nullify through injunctive
relief clearly unlawful conduct by Iron Triangle on three fronts:  (1) Iron Triangle's refusal to
sell Douglas fir and white fir logs to Prairie Wood, a potential competitor for the next 10-year
stewardship contract; and (2) Iron Triangle's blatantly illegal pine sawlog tying conspiracy
entered into with Malheur Lumber.  Without this injunctive relief, Prairie Wood Products will
be illegally deprived of the opportunity to operate its sawmill at a profit and will be forced out
of business in Prairie City.  Instead of a restored competitive landscape in the MNF Market
Area, the four existing monopoly and monopsony positions held by Iron Triangle will
continue for at least another decade, inflicting massive economic harm on the local economy
in Grant and Harney counties, a family-owned sawmill with decades of involvement in the
community, independent logging companies that would otherwise flourish in a free and open
competitive market and private forestland owners who will see the value of their forestlands
diminished to a negative value and face enhanced fire risk through inability to manage their
forestlands.

89.     Having reopened its Prairie City sawmill on July 11, 2022, Prairie Wood
Products is in the midst of restoring and updating its sawmill complex and re-permitting its co-
generation electrical facility, which has the capability of consuming substantial quantities of

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

forest biomass within the Malheur National Forest Market Area that can play a major role in substantially reducing forest fire risk in the area. Prairie Wood Products intends to invest $3 million in reopening and upgrade costs by mid-2023. The company has already invested over $500,000 in a new lumber edging scanning optimizer and the retrofit of its small boiler. However, in the face of the threat that Iron Triangle will reimpose its refusal to sell Douglas fir or white fir logs to this plaintiff, its monopoly position as seller of these products and its propensity for predatory bidding, Prairie Wood Products faces the substantial risk that it will be unable to secure the two million board feet of logs per month necessary to support a one-shift operation on an ongoing basis.

90.     To ensure at least break-even operations and, depending on the state of the U.S. lumber market, which has been falling, Prairie Wood must secure an average monthly log volume of two million board feet.

91.     With 136 million board feet of volume under contract, which Forest Service appraisals show includes 40% or 54 million board feet of Douglas fir and white fir, Iron Triangle has the capacity to supply Prairie Wood with over two years of the company's raw material requirements on a one-shift operation, but Iron Triangle has previously refused and, absent injunctive relief, may reimpose its refusal to sell any of it stockpiled volume under contract to Prairie Wood.

92.     To prevent Iron Triangle from using its dominant monopoly power over the sale of logs in the Malheur National Forest Market Area to destroy Prairie Wood as a competitor in the markets for acquisition of timber harvest rights on public and private forestlands and the markets for sale of forest stewardship services and contract logging services, this Court must act promptly to declare that Iron Triangle's illegal tying conspiracy

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

with Malheur Lumber and its refusal to deal with Prairie Wood in the sale of its monopolized sawlog volume are illegal violations of the Sherman Act and issue a preliminary injunction (i) prohibiting the illegal tying conspiracy with Malheur Lumber, and (ii) requiring Iron Triangle to sell Douglas fir and white fir logs to Prairie Wood at nondiscriminatory prices on a continuing basis.

93.    Further, with respect to the next 10-year Forest stewardship contract scheduled to be bid in the third quarter of 2023, the Forest Service must give due consideration to the massive level of damage to free and open competition within log-related markets in the MNF Market Area caused by the award of a 10-year stewardship contract in 2013 guaranteeing 70% of the annual timber harvest over 10 years to a single bidder that then leveraged that market power into the monopolization or monopsonization of four different markets within the MNF Market Area as described above. Based on the facts revealed in this Complaint, which will be fully corroborated by discovery in the coming months, and the abysmal experience of the Forest Service with long-term log supply agreements on the Tongass National Forest, the Forest Service should not only divide the upcoming next 10-year forest stewardship contract scheduled to be bid in March 2023 into two or more components, but also redefine its "best value" selection criteria to include consideration of restoring competitive conditions to the four markets that Iron Triangle currently monopolizes. Indeed, the concentration of a 70% share of the timber sale program over 10 years on the Malheur National Forest in a single stewardship contract is the root precipitating cause of the distortion of market conditions within the Malheur National Forest Market Area that facilitated Iron Triangle's monopolization of the four markets described above.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

94.     If Prairie Wood Products is forced out of business due to the destruction of competitive conditions within the MNF Market Area, Iron Triangle will have inflicted damages including lost profits and the complete destruction of Prairie Wood Products' business. In that event, Prairie Wood Products' damages will be proven with specificity at trial, but are currently estimated to total $35 million in lost profits and loss of total business value.

95.     As a result of Iron Triangle and co-conspirator Malheur Lumber's use of anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff Rude Logging LLC suffered lost profits over the last four years in an amount that will be proven with specificity at trial but currently estimated to be $650,000.

96.     As a result of Iron Triangle and co-conspirator Malheur Lumber 's use of anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff Engle Contracting, LLC suffered lost profits over the last four years in an amount that will be proven with specificity at trial but currently estimated to be $80,000.

97.     As a result of Iron Triangle and co-conspirator Malheur Lumber's use of anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiffs Brett Morris and Morris Forestry LLC suffered lost profits over the last four years in an amount that will be proven with specificity at trial but currently estimated to be $120,000.

98.     As a result of Iron Triangle and co-conspirator Malheur Lumber's use of anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiff H Timber Contracting LLC suffered lost profits over the last four years in an amount to be proven with specificity at trial but currently estimated to be $120,000.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

99.     As a result of Iron Triangle and co-conspirator Malheur Lumber's use of anticompetitive tactics to secure the monopolization of four different log-related markets, plaintiffs Doug and Darrell Emmel doing business as Emmel Brothers Ranch and Pat and Hedy Voigt doing business as Ricco Ranch have suffered lost profits in the form of forgone timber revenues on dead or dying timber that is now not marketable. Each plaintiff rancher (Emmel Brothers Ranch and Ricco Ranch) has suffered damages over the last four years in amounts that will be proven with specificity at trial but currently estimated to be $120,000 for Emmel Brothers Ranch and $120,000 for Ricco Ranch.

## FIRST CLAIM FOR RELIEF:

## MONOPOLIZATION

100.     Plaintiffs reallege paragraphs 1 through 99.

101.     Iron Triangle possesses monopoly power with market shares of 95% or more in the four distinct product markets that are geographically confined to the MNF Market Area as alleged above. Those four product markets are the markets for Stewardship Services, Timber Harvest Rights, Logging Services and Softwood Sawlogs.

102.     As alleged above, Iron Triangle has willfully and intentionally utilized a synergistic combination of anticompetitive tactics to obtain overwhelmingly dominant monopoly or monopsony power over four log-related product markets in the MNF Market Area.

103.     Each plaintiff in this action has suffered past and future damages as described above.  Plaintiffs' single damages total an estimated $36.2 million, which are trebled under the antitrust laws to $108.6 million.

104.     Plaintiffs are entitled to an award of attorney's fees and costs.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

105.    Plaintiffs are entitled to an award of prejudgment interest on all damages that predate the filing of this Complaint.

## SECOND CLAIM FOR RELIEF:

## CONSPIRACY IN RESTRAINT OF TRADE

106.    Plaintiffs reallege paragraphs 1 through 99.

107.    As alleged above, Iron Triangle and Malheur Lumber have entered into a combination and conspiracy whereby Malheur Lumber refuses to deal with Iron Triangle's competitors in order to foreclose their ability to sell pine sawlogs locally and thereby undermine their ability to compete with Iron Triangle in the monopolized markets.

108.    Each plaintiff in this action has suffered past and future damages as described above.  Plaintiffs' single damages total an estimated $36.2 million, which are trebled under the antitrust laws to $108.6 million.

109.    Plaintiffs are entitled to an award of attorney's fees and costs.

110.    Plaintiffs are entitled to an award of prejudgment interest on all damages that predate the filing of this Complaint.

WHEREFORE, plaintiffs pray for the following:

1.    Temporary, preliminary and permanent injunctive relief to reestablish competitive conditions in four log-related markets in the Malheur National Forest Market Area;

2.    Judgment on their Sherman Act and Clayton Act antitrust claims against defendants, jointly and severally, for treble damages in the approximate amount of $108.6 million;

3.    An award of plaintiffs' reasonable attorney's fees and costs;

Page 38 – FIRST AMENDED COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

4.    An award of prejudgment interest on all damages predating the filing of this Complaint; and

5.    Such other relief that the Court deems appropriate.

DATED this 25th day of January, 2023.

HAGLUND KELLEY LLP

By:  *s/ Michael E. Haglund*
Michael E. Haglund, OSB No. 772030
Eric J. Brickenstein, OSB No. 142852
Christopher T. Griffith, OSB No. 154664

Attorneys for Plaintiffs

Page 39 – FIRST AMENDED COMPLAINT



**EXHIBIT A**

**Page 1 of 1**

Page 40 – FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 25, 2023, I served the foregoing through CM/ECF

to the following attorneys at the listed email addresses:


Timothy W. Snider
Rachel C. Lee
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
*timothy.snider@stoel.com*
*rachel.lee@stoel.com*


Lawson E. Fite
John B. Lyman
Marten Law LLP
1747 Pennsylvania Ave. NW, Suite 1250
Washington, DC  20006
*lfite@martenlaw.com*
*jlyman@martenlaw.com*

*Attorneys for Defendants*


**HAGLUND KELLEY LLP**

By:*s/Michael E. Haglund*
MICHAEL E. HAGLUND, OSB No. 772030
ERIC BRICKENSTEIN**,** OSB No. 142852
CHRISTOPHER T. GRIFFITH, OSB No. 154664
Telephone:  (503) 225-0777

Attorneys for Plaintiffs


Page 41 – FIRST AMENDED COMPLAINT