IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MALHEUR FOREST FAIRNESS
COALITION, an unincorporated
association; PRAIRIE WOOD PRODUCTS,
LLC, an Oregon limited liability company;
RUDE LOGGING LLC, an Oregon limited
liability company; BRETT MORRIS, an
individual; MORRIS FORESTRY LLC, an
Oregon limited liability company; ENGLE
CONTRACTING, LLC, an Oregon limited
liability company; H TIMBER
CONTRACTING LLC, an Oregon limited
liability company; DOUG EMMEL and
DARRELL EMMEL, dba Emmel Brothers
Ranch; PAT VOIGT and HEIDI VOIGT,
dba Ricco Ranch,

No. 2:22-cv-01396-HZ

OPINION & ORDER

          Plaintiffs,

   v.

IRON TRIANGLE, LLC, an Oregon limited
liability company; I.T. LOGGING, INC., an
Oregon corporation; RUSSELL YOUNG, an
individual; OCHOCO LUMBER dba
Malheur Lumber Company,

          Defendants.

1 – OPINION & ORDER

Christopher T. Griffith
Christopher G. Lundberg
Eric J. Brickenstein
Michael E. Haglund
Haglund Kelley LLP
2177 SW Broadway
Portland, OR 97201

      Attorneys for Plaintiffs

Timothy W. Snider
Rachel C. Lee
Stoel Rives LLP
760 SW Ninth Ave, Suite 3000
Portland, OR 97205

Matthew Segal
Stoel Rives LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814

Lawson E. Fite
John Lyman
Marten Law LLP
1050 SW Sixth Ave, Suite 2150
Portland, OR 97204

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiffs are several businesses that own and operate a sawmill, purchase public timber sales and provide contract logging services, provide forest stewardship contract services, and own private forestlands in the area of the Malheur National Forest in eastern Oregon. Plaintiffs bring claims for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants Iron Triangle, LLC, I.T. Logging, Russell Young, and Ochoco Lumber Company d/b/a Malheur Lumber Company ("Malheur Lumber"). Plaintiffs allege that Defendant

Iron Triangle has used a combination of anticompetitive tactics to obtain monopoly or monopsony power in four forest products-related markets in a market area consisting of the Malheur National Forest and private forestlands in Grant County and the northern third of Harney County, Oregon. Plaintiffs also allege that Iron Triangle and Malheur Lumber conspired to undermine their ability to compete in the monopolized markets.

Defendant Iron Triangle and Defendant Malheur Lumber each move to dismiss Plaintiffs' First Amended Complaint. As explained below, the Court grants Defendants' motions to dismiss.

## BACKGROUND

Defendant Iron Triangle is an Oregon limited liability company that provides forest stewardship services, purchases timber sale contracts, provides contract logging services, and sells softwood sawlogs and pulp logs. First Am. Compl. ("FAC") ¶ 28, ECF 30. In 2013, after a competitive bidding process, the U.S. Forest Service awarded Iron Triangle a 10-year stewardship contract for the Malheur National Forest. FAC ¶¶ 3, 4. The purpose of the $69 million stewardship contract is to "revive the local timber industry" while also promoting the health of the forest through stewardship services that include commercial thinning, road maintenance, fire risk reduction, and related services. FAC ¶¶ 3, 31. The contract also provides Iron Triangle with right of first refusal to purchase timber harvest rights on 70% of the federal timber available for sale from the Malheur National Forest. FAC ¶ 35. The 10-year stewardship contract expires in 2023, and Plaintiffs anticipate a competitive bidding process for the next stewardship contract during the third quarter of 2023. FAC ¶ 17.

Plaintiffs Rude Logging LLC ("Rude Logging"), Engle Contracting, LLC ("Engle Contracting"), Bret Morris and Morris Forestry, LLC (together, "Morris Forestry"), and H Timber Contracting LLC ("H Timber") (collectively, "Logger Plaintiffs") are companies that provide contract logging services. FAC ¶¶ 22-25. In Fall 2013, after it was awarded the 10-year

stewardship contract, Iron Triangle subcontracted logging services to other companies, including Plaintiffs Rude Logging and Engle Contracting. FAC ¶ 42. The next year, Iron Triangle presented logging subcontracts to the same logging companies at reduced rates for timber stands where logging would be less efficient and more costly for the logging companies. FAC ¶ 43. Engle Contracting declined to accept the reduced rates. FAC ¶ 43. Rude Logging continued to perform contract logging services at the reduced rates for two more years. FAC ¶ 43. In 2016, Rude Logging declined any further contract proposals from Iron Triangle because over the previous two years, it had barely covered its costs with little to no profit. FAC ¶ 43. At the same time, Plaintiffs allege that Iron Triangle extracted "monopoly profits" by overcharging the U.S. Forest Service for the work of removing, harvesting, and delivering logs to manufacturers. FAC ¶ 46. Plaintiffs contend that Iron Triangle's "supra-competitive rates" have "more than tripled the original $69 million 'not to exceed' cost of the 10-year stewardship contract." FAC ¶ 45.

Plaintiffs also allege that Iron Triangle used the monopoly profits from overbilling the U.S. Forest Service for its forest stewardship services to engage in predatory bidding in open timber market sales. FAC ¶ 48. Along with the right of first refusal on 70% of annual timber harvest offered by the U.S. Forest Service, Iron Triangle successfully outbid competing logging companies on most of the remaining 30%. FAC ¶ 48. In September 2018 and January 2019, Iron Triangle submitted sealed bids at 2.72 and 1.44 times higher than then second higher bids. FAC ¶ 50. And in 2021, Iron Triangle submitted bids on two timber sales that were 1.56 and 1.76 times the second highest bids. FAC ¶ 51. Plaintiff Rude Logging was one of the top unsuccessful bidders on three of these four timber sales. FAC ¶ 51. By the end of 2021, Iron Triangle had increased the volume of its contracted timber harvest rights from 22.3 to 128.3 million board feet, which constitutes 95% of the offered volume in the Malheur National Forest. FAC ¶ 52.

Wood product manufacturers, such as Plaintiff Prairie Wood Products, LLC ("Prairie Wood") and Defendant Malheur Lumber, source logs by directly purchasing them from logging companies, by directly acquiring timber harvest rights, or by participating in contract logging agreements between logging companies and private landowners. FAC ¶ 53. According to Plaintiffs, Malheur Lumber is the only purchaser of *pine* sawlogs in the MNF Market Area. In 2020, Iron Triangle agreed to sell Malheur Lumber more than two-years' worth of Malheur Lumber's requirement for pine sawlogs from the 95.3 million board feet of timber it controlled in the Malheur National Forest. FAC ¶ 54. Plaintiffs allege that the agreement between Defendants required Malheur Lumber to purchase all contract logging services from Iron Triangle only. FAC ¶ 54. Plaintiffs assert that the agreement included a commitment by Malheur Lumber not to buy pine sawlogs from any other logging company or participate in any logging company's contracts with private landowners in the Malheur National Forest market area, including Plaintiffs Emmel Brothers Ranch and Ricco Ranch (collectively, "Landowner Plaintiffs"). FAC ¶ 54. Malheur Lumber thus refused to purchase sawlogs or logging services from Logger Plaintiffs. FAC ¶ 55. When Malheur Lumber did offer to buy sawlogs from Logger Plaintiffs, it quoted them purchase prices lower than Logger Plaintiffs' costs of production. FAC ¶¶ 55, 56. According to Plaintiffs, Defendants' agreement that Malheur Lumber only purchase sawlogs from Iron Triangle has excluded Logger Plaintiffs from the logging services market in the Malheur National Forest market area and has hurt Landowner Plaintiffs by rendering harvest lands on private lands uneconomical. FAC ¶ 57.

Plaintiff Prairie Wood manufactures structural dimension lumber primarily from *fir* logs sourced from the Malheur National Forest market area. FAC ¶ 9. After closing in 2009 during an economic recession, Prairie Wood reopened its sawmill in Prairie City, Oregon in July 2022.

FAC ¶ 9. Iron Triangle refused to sell fir sawlogs to Prairie Wood when its mill reopened. FAC ¶ 59. Instead, Iron Triangle hauled those logs to a plywood plant 140 miles away. FAC ¶ 59. Iron Triangle's owner told Prairie Wood's manager that it did not have any logs available to sell. FAC ¶ 60. Plaintiffs allege that Iron Triangle President Russell Young was "furious" about Prairie Wood's decision to reopen without consulting him and that an Iron Triangle employee stated: "We're going to shut them down before they start." FAC ¶¶ 77, 78.

After Plaintiffs filed this action, Iron Triangle sold "a limited supply of logs" to Prairie Wood. FAC ¶ 10. Along with restricting the supply of *fir* logs to Prairie Wood, Plaintiffs allege that Malheur Lumber refused to buy *pine* sawlogs from Prairie Wood. FAC ¶ 12. According to Plaintiffs, by denying Prairie Wood a market to sell pine logs, Defendants restricted Prairie Wood's ability to bid competitively on timber sales containing mixed pine and fir in the Malheur National Forest market area. FAC ¶ 12.

Plaintiffs contend that Defendants' actions have damaged free and open competition in what Plaintiffs define as the Malheur National Forest market area ("MNF Market Area") and have caused each Plaintiff to suffer damages in the form of lost profits. FAC ¶¶ 93-99.

## STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations

must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint must state a plausible claim for relief and contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## DISCUSSION

Plaintiffs bring a claim for monopolization under Section 2 of the Sherman Act against Defendant Iron Triangle, alleging that Defendant used a combination of anticompetitive tactics to gain monopoly or monopsony power over four log-related product markets. Plaintiffs also bring a claim for conspiracy in restraint of trade under Section 1 of the Sherman Act, alleging that Defendants Iron Triangle and Malheur Lumber conspired to undermine Plaintiffs' ability to compete with Iron Triangle in the monopolized markets.

In support of its Motion to Dismiss, Defendant Iron Triangle moves for judicial notice of certain facts that support its argument that Plaintiffs' market area definition and predatory bidding allegations are implausible. Plaintiffs oppose Defendant's Motion for Judicial Notice.

### I.    Motion for Judicial Notice

Courts may take judicial notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Evid. 201(b). Courts may judicially notice information such as press releases or contents of a website when they are "matters of public record." *Lee v. City of Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001). But when ruling on a motion to dismiss, a court "may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed." *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2001). When a court takes judicial notice of a public record, "it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity." *Klein v. Freedom Strategic Partners, LLC,* 595 F. Supp. 2d 1152, 1157 (D. Nev. 2009) (quoting *Lee,* 250 F.3d at 690).

Defendant Iron Triangle asks the Court to take judicial notice of three categories of information: (1) maps of the relevant portion of the state of Oregon; (2) facts regarding the location of other government forestlands in Grant County and Harney County; and (3) facts related to Plaintiffs' successful bids on timber sales from the Malheur National Forest. Def. Mot for Judicial Notice 2-3, ECF 36. First, as to the maps, a court may take judicial notice of geographic facts presented on maps if the accuracy of the maps cannot be reasonably questioned. *United States v. Perea-Ray*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012). The Court does not question the authenticity of the maps Defendant provides that were produced by the Oregon Department of Forestry and the Oregon Department of Transportation. Declaration of Rachel Lee ("Lee Decl.") Ex. 5, Ex. 6, ECF 38. But the Court cannot readily determine the accuracy of the map included as Appendix A to Defendant Iron Triangle's Motion to Dismiss. ECF 35. Defendant created that map from online sources and used Microsoft PowerPoint to manually add labels naming cities, counties, and national forests. Defendant then annotated the map with a red-circle that they assert depicts a 75-mile radius around the city of John Day, Oregon. Because

Appendix A contains a map that was created and manipulated by Defendant, the Court cannot assume the accuracy of the information contained in the map. Thus, the court declines to take judicial notice of Defendant Iron Triangle's Appendix A.

The Court also declines to take judicial notice of information about the location of forestlands and Plaintiffs' successful bids on timber sales. Defendant asks the Court to judicially notice these facts for the purpose of disputing facts alleged by Plaintiffs in their Amended Complaint. As for the location and ownership of forestlands, Defendant seeks to use this information to challenge Plaintiffs' definition of the relevant market area. And with the successful bids on timber sales, Defendant seeks to present evidence that contradicts Plaintiffs' assertion that they have been foreclosed from the harvest rights market. In essence, Defendants ask the Court to consider extrinsic evidence to challenge Plaintiffs' factual allegations.

The Ninth Circuit has explained that "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee*, 250 F.3d at 688. In *Lee*, the Ninth Circuit held that the district court erred by "assum[ing] the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs." *Id.* Thus, courts must not consider a defendant's "extrinsic evidence in order to make a factual finding and inference that contradict[s] the allegations in the complaint." *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1022 (D. Or. 2015).

Judicial notice may be appropriate at the motion to dismiss stage when the judicially noticed facts render a plaintiff's factual allegations implausible. But here, Defendant asks the Court to acknowledge facts beyond the four corners of Plaintiffs' Complaint that create factual disputes. Defendant asks the Court to draw inferences from those facts in their favor. But on a

motion to dismiss, the Court must accept the factual allegations in Plaintiffs' Complaint as true and draw all reasonable inferences in Plaintiffs' favor. *Lee*, 250 F.3d at 690. Thus, because Defendant seeks to introduce extrinsic evidence that favor its position to disprove Plaintiffs' factual allegations, its request for judicial notice of the location of forestlands and successful timber bids is denied. *See id.* (finding that the district court erred "by relying on extrinsic evidence and taking judicial notice of disputed matters of fact" on a motion to dismiss). The Court takes judicial notice of the two publicly available maps submitted as Exhibit 5 and Exhibit 6 to the Lee Declaration but declines draw inferences in Defendant Iron Triangle's favor based on the information contained in those maps.[1]

## II.    Monopolization, 15 U.S.C. § 2

The Sherman Act makes it unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize. 15 U.S.C. § 2 ("Section 2"). To state a Section 2 claim for monopolization, a plaintiff must plead: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.,* 88 F.3d 780, 783 (9th Cir.1996) (citation omitted).

Plaintiffs claim that Defendant Iron Triangle[2] holds a monopoly as a seller or holds a monopsony as a buyer in the "Stewardship Services Market," the "Harvest Rights Market," the

---

[1] The map submitted as Exhibit 5 to the Lee Declaration is available at this public website: https://oregon-department-of-forestry-geo.hub.arcgis.com/documents/oregon-federal-and-state-forests-2017/explore. The maps submitted as Exhibit 6 to the Lee Declaration are available at these publicly available websites:
https://www.oregon.gov/odot/Data/Documents/Region_reg4.pdf;
https://www.oregon.gov/odot/Data/Documents/Region_reg5.pdf.

[2] Although Defendant Malheur Lumber's motion to dismiss also addresses Plaintiffs' Section 2 monopolization claim, this cause of action does not appear directed at it. *See* FAC ¶¶ 100-105 (referencing only Defendant Iron Triangle with respect to Plaintiffs' monopolization claim).

"Logging Services Market," and the "Softwood Sawlogs Market" in what Plaintiffs have defined as the MNF Market Area. Defendant argues that Plaintiffs fail to state a claim for relief because (A) Plaintiffs' defined geographic market area is facially implausible and (B) Plaintiffs fail to plead, with sufficient specificity, facts that satisfy the three elements required for a Section 2 claim.

### A.    Relevant Geographic Market Area

Defendant first challenges Plaintiffs' alleged geographic market definition. To state a claim for monopolization under the Sherman Act, a plaintiff first "must allege that the defendant has market power within the 'relevant market.'" *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). "[A] market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation omitted). The validity of a plaintiff's defined market is "typically a factual element rather than a legal one." *Newcal Indus.*, 513 F.3d at 1045; *see High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("[D]efining the relevant market is a factual inquiry for the jury"). And there is no requirement that the relevant market be pled with specificity. *Newcal Indus.*, 513 F.3d at 1045. Thus, "a complaint should be dismissed under Rule 12(b)(6) *only* where 'the complaint's relevant market definition is *facially unsustainable*.'" *Vesta Corp.*, 129 F. Supp. 3d at 1013 (quoting *id.*) (emphasis added).

The relevant *geographic* market is the "area of effective competition where buyers can turn to alternative sources of supply." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (citation omitted). A common method for determining the relevant geographic market "is to find whether a hypothetical monopolist could impose a small but

significant nontransitory increase in price for the market product in the proposed market area." *Id.* (internal quotation and citation omitted).

Plaintiffs define the geographic market for all four product markets as "the Malheur National Forest and the surrounding or inholding private forestlands in Grant County and the northern third of Harney County, Oregon." FAC ¶ 1. Defendant Iron Triangle argues that Plaintiffs gerrymandered the alleged geographic market area to inflate Defendant's apparent market share. Relying on its request for judicial notice, Defendant notes that other national and state forests are located within Grant County and the northern third of Harney County but are excluded from Plaintiffs' geographic market definition. Plaintiffs counter that their definition of the MNF Market Area is valid because it is based on logical economic considerations such as the limited distances fungible logs can be profitably transported for manufacturing.

As noted above, "defining the relevant market is fact-intensive inquiry." *Vesta Corp.*, 129 F. Supp. 3d at 1025; *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ("The proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers.") (internal quotation marks and citation omitted). Relying on the facts alleged in the Complaint, the Court finds that Plaintiffs' geographic market is not facially unsustainable. Defendant's attempt to introduce extrinsic evidence through judicial notice only creates a dispute of fact. *See* I, *supra*. On a motion under Rule 12(b)(6), the Court must accept Plaintiffs' well-pleaded facts as true and draw any inferences in Plaintiffs' favor. Although the Court may judicially notice the location of towns and forestlands based on publicly available maps, it cannot make inferences in Defendant's favor as to the economic or market significance of those locations. Accordingly, the Court finds that Plaintiffs' alleged "MNF

Market Area" is facially sustainable and the monopolization claim cannot be dismissed on this basis at this stage of the proceedings.

**B.    Section 2 Monopolization Elements**

Defendant also challenges whether Plaintiffs have adequately alleged the elements necessary to state a Section 2 monopolization claim in each of the alleged markets: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *SmileCare Dental,* 88 F.3d at 783 (citation omitted).

Defendant argues that Plaintiffs have failed to allege facts which—taken as true— plausibly state a monopolization claim in each of the four markets. Plaintiffs' response largely focuses on Defendant's conduct and its effects across product markets, providing limited explanation for how their complaint pleads all the elements of monopolization in each of the four markets individually. But the Ninth Circuit has made clear that "[a]ntitrust violations must be judged on a market-by-market basis." *United States v. Syufy Enterprises*, 903 F.2d 659, 672 n. 22 (9th Cir. 1990). Indeed, the elements of a Section 2 claim are necessarily defined by individual markets. *See Vesta Corp.*, 129 F. Supp. 3d at 1022 (to establish a Section 2 claim, a plaintiff must plead and prove "possession of monopoly power *in the relevant market*") (emphasis added).

Perhaps Defendant's conduct within one market is relevant to the analysis of whether Plaintiffs have pled all the elements of a Section 2 claim in a downstream market. For example, even if Defendant does not have monopoly power in upstream markets, its market share in those markets—and whatever conduct resulted in that share—could be relevant to the monopoly power analysis in downstream markets. For that reason, the Court's analysis of anticompetitive behavior below focuses on the conduct and the markets allegedly affected, and not on the specific market the conduct occurred in. However, the Court cannot treat all product markets as

one for purposes of evaluating whether Plaintiffs have alleged each of the elements of a monopolization claim in each of the alleged markets. Such an approach offends the prescribed Section 2 analysis and Plaintiffs cite no case law supporting it.[3]

Accordingly, to survive Defendant's motion to dismiss, Plaintiffs must state a claim for monopolization in at least one of the alleged product markets. The Court evaluates each element of Plaintiffs' monopolization claim below.

      *i.    Monopoly/Monopsony Power*

To plead the first element of a Section 2 claim, a plaintiff must allege that the defendant has monopoly power within a "relevant market." Monopoly power is "the substantial ability to control prices or exclude competition." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (internal citations and quotations omitted). "Monopoly power differs in degree from market power, requiring 'something greater.'" *Id.* (quoting *Eastman Kodak*, 504 U.S. at 481).

A plaintiff can establish monopoly power with direct evidence of restricted output and supra-competitive prices, or with circumstantial evidence. *Rebel Oil,* 51 F.3d at 1434; *see also Epic Games, Inc.*, 67 F.4th at 998 ("Like market power, monopoly power can be established either directly or indirectly"). To demonstrate monopoly power circumstantially, a plaintiff must: (1) define the relevant market,[4] (2) show that the defendant owns a dominant share of that

---

[3] While Plaintiffs do cite several cases they believe hold that conduct may be viewed in the aggregate to satisfy the *anticompetitive conduct element* individually—addressed *infra* at II.B.ii.e.—they cited no case law for the proposition that the Court need not take a market-by-market approach to evaluating the Section 2 claim as a whole.

[4] The relevant market encompasses notions of geography as well as product use, quality, and description. *Newcal Indus.*, 513 F.3d at 1045 n.4 ("Antitrust law requires allegation of both a product market and a geographic market"). The Court has already addressed the geographical market, and Defendant does not appear to challenge Plaintiffs' defined product market beyond its geography at this stage. Accordingly, the Court's analysis here is confined to Defendant's power in each of the four alleged product markets.

market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* (citations omitted). Defendant argues that Plaintiffs have failed to allege monopoly or monopsony power in each of the alleged product markets.

   a. Monopoly Power in the Stewardship Market

  The Stewardship Services Market is the market to provide forest stewardship services such as precommercial thinning, road maintenance, and fire reduction. Defendant Iron Triangle is a seller in this market and holds a 100% market share after being awarded a 10-year stewardship contract by the U.S. Forest Service in 2013. The only buyer in the relevant market area is the U.S. Forest Service. When the 10-year stewardship contract expires in 2023, Plaintiffs anticipate a competitive bidding process for the next stewardship contract.

  Plaintiffs plausibly allege, and Defendant does not appear to dispute, that Defendant currently holds a 100% market share of the Stewardship Services Market based on its award of the exclusive contract by the U.S. Forest Service. But Defendant argues that it cannot have monopoly power under the circumstances in this case when the only buyer in the market is the federal government. Defendant asserts that it cannot set monopoly prices and force the government to pay supra-competitive prices for its stewardship services because the U.S. Forest Service is bound by federal regulations to pay reasonable prices and award contracts on a best-value basis. *See* 36 C.F.R. § 223.302.

  Courts have held that a private entity who wins a competitive government contract holds no monopoly power because the entity cannot control prices or exclude other bidders. *See, e.g.*, *Nat'l Reporting Co. v. Alderson Reporting Co.*, 763 F.2d 1020, 1024 (8th Cir. 1985). When the government is the only buyer in the market, the monopoly seller cannot exercise monopoly

power to set prices because the government "can simply walk away from the transaction." *GMA Cover Corp. v. Saab Barracuda LLC*, No. 10-CV-12060, 2012 WL 642739, at *7 (E.D. Mich. Feb. 8, 2012), *report and recommendation adopted*, 2012 WL 639528 (E.D. Mich. Feb. 28, 2012). Although Defendant won the competitive stewardship services contract in 2013 and may win the renewal in 2023, it lacks the power to charge the government a supra-competitive price. That is particularly true here, where the U.S. Forest Service is bound by regulation not to pay an unreasonable price, precluding Iron Triangle from charging a supra-competitive price. *See* 36 C.F.R. § 223.302.

Plaintiffs seek to distinguish *Saab Barracuda* by noting that here, unlike in that case, there is a downstream market. But while that fact may mean that Defendant's share of the Stewardship Services Market and its conduct within that market are relevant to the analysis of monopolization *in those downstream markets*, the mere existence of downstream markets does not alter the analysis of monopoly power within the Stewardship Services Market itself.

Defendant also contends that Plaintiffs cannot plead monopoly power in the Stewardship Services Market because Defendant cannot exclude others from bidding on the renewal of the stewardship services contract. The Court agrees. The Complaint fails to plausibly allege that Defendant may exclude Plaintiffs from bidding on renewal of the stewardship services contract. *See, e.g.*, *Kirk-Mayer v. Pac Ord, Inc.*, 626 F. Supp. 1168, 1171-72 (C.D. Cal. 1986) ("a government contractor who obtains the contract for a fixed term at a fixed price in open bidding against a number of other bidders—the contractor does not have the power to control prices or exclude competition"). Taking Plaintiffs' allegations as true, they have not stated a Section 2 claim for monopolization of the Stewardship Services Market.

b.  Monopsony Power in the Harvest Rights Market

The Harvest Rights Market is the market for timber harvest rights within the MNF market area. Defendant Iron Triangle is a buyer in this market. Under the 10-year stewardship contract, Defendant was awarded first refusal on the right to harvest 70% of the available timber in the Malheur National Forest. As an alleged monopsony buyer, Defendant has amassed 95% of the Harvest Rights Market for timber available in the market area. The only seller in this market is the U.S. Forest Service.

As with the Stewardship Services Market, Defendant obtained a dominant share (70%) of the Harvest Rights Market by winning a competitive bidding process with the U.S. Forest Service. Plaintiffs' monopolization claim pertains to the additional harvest rights Defendant has obtained through other competitive bids in open market timber sales in the Malheur National Forest. Plaintiffs allege that Defendant willfully increased and consolidated its monopoly power in the Harvest Rights Market by engaging in predatory bidding practices to outbid competitors for most of the other 30% of timber volume offered for sale.

Plaintiffs face the same issue in pleading monopsony power in the Harvest Rights Market as they do with pleading monopoly power Stewardship Services Market. The situation here is the inverse of that of the Stewardship Services Market in that here the federal government is a monopoly seller and Defendant is an alleged monopsony buyer. But as with the Stewardship Services Market, when there is only one buyer and one seller, the government "can simply walk away from the transaction." *Saab Barracuda LLC*, 2012 WL 642739 at *7. And just as the federal government is required not to accept not to pay an unreasonable price for stewardship services, it cannot sell timber below appraised value or minimum stumpage rates. *See* 36 C.F.R.

17 – OPINION & ORDER

§ 223.61. Likewise, it cannot preclude other buyers from bidding on harvest rights. Accordingly, Plaintiffs have not pled that Defendant has monopoly power in the Harvest Rights Market.

c.   Monopoly Power in the Logging Services Market

The Logging Services Market is the market for the purchase and sale of contract logging services, by which providers of logging services are paid to harvest sawlogs from the areas of the forest where timber harvest rights have been awarded or from private forest land.

Defendant contends that Plaintiffs have failed to allege monopoly power in the Logging Services Market because (1) the bare allegation that Defendant holds "a more than 95% market share," FAC ¶ 39, is conclusory; and (2) Plaintiffs fail to allege significant barriers to entry and expansion.

To argue that Plaintiffs' market share allegations are insufficient, Defendant relies on *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021). In that case, the FTC alleged that Facebook "maintained a dominant share of the U.S. personal social networking market (in excess of 60%)." *Id.* at 18. The court found that allegation insufficient to plausibly establish market share because it failed to provide "an estimated actual figure or range" of market share. *Id.* In support of that conclusion, the court cited a number of other cases in which plaintiffs imprecisely alleged "majority" or "over 50%" market share. *Id.*

This case differs markedly from *Facebook, Inc.* and the cases cited in it. A bare allegation of "majority" or "over 60%" lacks precision because it leaves a wide range of possible market shares. Because the general market share requirement for a monopolization claim is 65%, *see Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997), a bare assertion that market share "exceeds 60%" or constitutes "a majority" does nothing but restate the market share requirement without any facts about what the defendant's market share actually

is.  Here, by contrast, "over 95%" alleges a range of only 5% under a complete 100% market share, plausibly alleging more than just a bare recitation of the market share element. The Court finds that this allegation is enough to plead market share.

However, to allege monopoly power using circumstantial evidence, Plaintiffs must—in addition to dominant market share—plausibly allege "entry barriers and the capacity of existing competitors to expand output." *Rebel Oil,* 51 F.3d at 1438 n.10. They must show that "new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Id.* at 1439. "Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Id.* (internal quotations and citations omitted). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Id.* In addition, anticompetitive conduct can impose entry barriers. *See, e.g. Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (noting that anticompetitive tying arrangements can create entry barriers).

Plaintiffs allege:

The Logging Services Market is characterized by high barriers to entry due to the need to purchase and maintain specialized heavy equipment and develop the professional knowledge and experience to perform such services.  In addition, Iron Triangle has erected artificial barriers to entry through anticompetitive tactics including the tying arrangement entered into with co-conspirator Malheur Lumber which reduces the value of private timberland and thereby distorts and suppresses the economic incentive for private landowners and contract loggers to purchase or perform contract logging services on private forestlands.

FAC ¶ 38.

With respect to the requirement of specialized equipment and professional knowledge and experience, Plaintiffs have not pled facts to plausibly allege barriers to entry not incurred by Defendant. "The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993). Plaintiffs do not plead facts that establish that the equipment costs are higher for prospective new entrants than they were for Defendant. Likewise, Plaintiffs' Complaint does not allege that the requirement of experience and expertise were not also barriers to Defendant's entry in the Logging Services Market. In other words, Plaintiffs have not pled the "hallmark" of an entry barrier: that new entrants are disadvantaged as compared to incumbents. *Id.* As to Plaintiffs' allegation that the tying arrangement is itself a barrier to entry, that arrangement is inadequately alleged for the reasons set forth later in this opinion. *See infra* III.A.

Finally, Defendant argues that Plaintiffs fail to allege monopoly power because they do not allege any barriers to expansion. The Ninth Circuit has held that monopoly power "cannot be inferred solely from the existence of entry barriers and a dominant market share." *Rebel Oil*, 51 F.3d at 1441. A plaintiff must also plead barriers to expansion. *Id.* Plaintiffs' response does not address this argument, and the Court could not locate any allegations of expansion barriers in the Logging Services Market within Plaintiffs' Complaint. Accordingly, Plaintiffs have not adequately pled monopoly power within the Logging Services Market.

### d.  Monopoly Power in the Softwood Sawlogs Market

Defendant Iron Triangle is a seller in the Softwood Sawlogs Market. Both Defendant Malheur Lumber and Plaintiff Prairie Wood are buyers in the market. As alleged, Defendant

Malheur Lumber primarily buys *pine* sawlogs and is "the only purchaser of pine sawlogs in the market area." FAC ¶ 53. Whereas Prairie Wood buys only *fir* sawlogs (e.g., Douglas fir and white fir logs) to produce structural lumber. As Plaintiffs allege, rather than sell fir sawlogs to Plaintiff Prairie Wood, Defendant Iron Triangle transports that product 140 miles to an unnamed plywood plant. Plaintiffs also allege that Defendant Malheur Lumber refuses to *buy* pine sawlogs from Plaintiff Prairie Wood, which "severely restrict[s] Prairie Wood's ability to bid competitively on timber sales that contain a mix" of pine and fir. FAC ¶ 12. Plaintiff alleges that Defendant Iron Triangle is a monopoly seller in Softwood Sawlogs Market, holding a market share over 95%.

As with the Logging Services Market, Plaintiffs' allegation that Defendant holds more than 95% market share is sufficient to plead the market share component of monopoly power. However, Plaintiffs have not pled sufficient facts to establish entry and expansion barriers. As to entry barriers, Plaintiffs allege "the principal barrier to entering the Softwood Sawlog Market as either a buyer or seller is Iron Triangle's near total control of softwood sawlog supply though its dominance of the Harvest Rights Market and the Logging Services Market." FAC ¶ 41. Defendant argues that this allegation merely "bootstraps" the non-existent entry barriers in those upstream markets and therefore must also fail. The Court agrees with Defendant; because Plaintiffs did not plead monopoly or monopsony power in the upstream markets, the reliance on that power to establish entry barriers in the downstream market is misplaced. Moreover, as in the Logging Services Market, Plaintiffs have pled no barriers to expansion, which is necessary to establish monopoly power by circumstantial evidence. Plaintiffs have therefore failed to adequately plead monopoly power in the Softwood Sawlogs Market.

ii.    *Anticompetitive Conduct*

To satisfy the second element of a Section 2 claim, a plaintiff must allege "willful acquisition or maintenance" of monopoly power. To establish this element, a plaintiff must allege facts that show the defendant purposefully engaged in "anticompetitive conduct." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). The alleged monopolist must have acted in manner "that harms the competitive process as a whole," which does not necessarily depend on "the success or failure of individual competitors." *Id.* (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Without evidence of wrongdoing, the opportunity to gain monopoly power in a market is "an important element of the free-market system," which "induces risk taking that induces innovation and economic growth." *Id.* Acting with intent to harm a competitor is not enough—the alleged monopolist must intend to foreclose all competition in the market. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under federal antitrust laws." (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)).

Plaintiffs allege several theories of anti-competitive conduct and argue that even if any single theory does not amount to anti-competitive conduct, they amount to anticompetitive conduct sufficient to establish this element in the aggregate.

a.    Fraudulent/False Statements to the U.S. Government

Plaintiffs assert that Defendant Iron Triangle engaged in wrongful activity by misrepresenting its logging capacity to the U.S. Forest Service and lied about its intent to use the

stewardship services contract to help revitalize the local economy. Plaintiffs allege that this anticompetitive behavior within the Stewardship Services Market resulted in Defendant's ability to monopolize the downstream markets.

In asserting false statements or misrepresentation, Plaintiffs essentially contend that Defendant Iron Triangle obtained the stewardship services contract fraudulently. To allege fraud, Plaintiffs "must state with particularity facts the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In other words, Plaintiffs must allege facts that "give [D]efendants notice of the particular misconduct," including "the who, what, when, where, and how" of the alleged misrepresentations. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Plaintiffs provide only conclusory allegations of misrepresentations by Defendant without particular facts to support those allegations. Thus, Plaintiffs' claim that Defendant fraudulently obtained the stewardship services contract "stops short of the line between possibility and plausibility" because it lacks "further factual enhancement." *Twombly*, 550 U.S. at 557.

b.   Predatory Bidding

Plaintiffs also allege that Defendant engaged in predatory bidding within the Harvest Services Market which affect both upstream and downstream markets. Defendant argues that the allegations in the Complaint are conclusory and fail to allege the facts necessary to plausibly state a Section 2 claim based on predatory bidding.

Claims for predatory bidding against a monopsony buyer are analytically similar to predatory pricing claims against a monopoly seller. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321 (2007). In a predatory *pricing* scheme, the predator-seller reduces the sales price of its product to drive competitors out of business. *Id.* at 318. Because price cutting stimulates competition and benefits consumers, a plaintiff must show

more than that the alleged predatory prices are lower than the competitors' prices. After the competitors have been driven from the marketplace, the predator raises prices to a supra-competitive level to recoup its costs. *Id.* Thus, a predatory pricing claim requires proof of two elements: (1) that the predatory price was below the alleged predator's cost of production and (2) that the alleged predator had "a dangerous probability of recouping its investment in below-cost prices." *Brooke Grp. Ltd.*, 509 U.S. at 222-224. Similarly, predatory *bidding* involves a predator-buyer bidding up the market price of product so high that competitors cannot survive in the market, and the predator acquires monopsony power. *Weyerhaeuser*, 549 U.S. at 320. Once all competitors have been vanquished, the predatory bidder must recoup its costs by restricting the price at which it purchases additional product to below competitive levels. *Id.* at 321.

Predatory bidding schemes "are rarely tried, and even more rarely successful." *Id.* at 323 (quoting *Brooke Grp.*, 509 U.S. at 226). Such schemes require the alleged predator to suffer a short-term loss "on the chance of reaping supracompetitive profits in the future." *Id.* So, as with predatory pricing, predatory bidding requires buying at a price that results in a loss. In other words, "the predator's bidding on the buy side must have caused the relevant cost of the output to rise above the revenues generated in the sale of those outputs." *Id.* at 325. Because business buyers often present high bids to compete for scarce inputs in the normal course of competition, predatory bidding is difficult to prove. Along with showing that the alleged predator bid in a manner that caused a loss, the plaintiff must show that the predator "has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power." *Id.*

Defendant first argues that Plaintiffs have not pled facts sufficient to establish that Defendant bid in a manner which caused a loss. Plaintiffs allege that Defendant predatorily bid

on open timber harvest sales in Malheur National Forest offered by the U.S. Forest Service.
Plaintiffs allege that at oral ascending auctions for nine timber sales in 2016 and 2017, Defendant
kept bidding until the last competitor dropped out. Plaintiffs also allege that between 2018 and
2021, Defendant submitted sealed bids that were between 1.44 and 2.72 times higher than the
next high bid on four timber sales. Without presenting any figures or estimates, Plaintiffs
contend that these bids "imposed a loss on Iron Triangle because it[s] sawlog sale revenues from
the timber sale fell below all of its costs for stumpage, logging and truck hauling." FAC ¶ 50.
Similarly, the Complaint lacks any allegations to explain how there is a "dangerous probability"
that it could recoup that loss once competitors are vanquished.

Plaintiffs' claims that Defendant bid in a manner which caused a loss—and that there is a
dangerous probability it can recoup those loses—are conclusory. Plaintiffs fail to provide factual
support for this inference. *See Vesta Corp.*, 129 F. Supp. 3d at 1033 (finding that the plaintiff
failed to state a predatory pricing claim when it did not "identify any figures or estimates of
Defendant's costs"). Thus, Plaintiffs' assertion that Defendant outbid competitors in oral
auctions and bid significantly higher than the second highest bidder in sealed auctions are
insufficient factual allegations to state a claim for predatory bidding.

c. Refusal to Deal

Plaintiffs' Complaint alleges that Defendant refused to deal with other participants in the
Logging Services Market and the Softwood Sawlogs Market. Defendant argues that Plaintiffs'
allegations of refusal to deal cannot establish anticompetitive conduct.

First, in the Logging Services Market, Plaintiffs allege that Defendant offered
competitors within the Logging Services Market uneconomic logging services contracts as part
of "a deliberate anti-competitive strategy to eliminate [Logger Plaintiffs] from competing with

Iron Triangle in the MNF Market Area." FAC ¶ 44. Plaintiffs allege that when Defendant was initially awarded the stewardship contract in 2013, it subcontracted logging services to several loggers, including Plaintiffs Rude Logging and Engle Contracting. The next year, Defendant presented subcontracts to the same group of loggers but at reduced rates uneconomical for Plaintiffs. Thus, according to Plaintiffs, Defendant effectively squeezed them out of the Logging Services Market in the Malheur National Forest area over which Defendant had complete control.

The bare assertion that Defendant offered rates that were not to Logger Plaintiffs' liking does not adequately plead anticompetitive conduct. To satisfy the anticompetitive conduct element of a Section 2 claim, Plaintiffs must allege that Defendant's conduct was taken "with an intent to control prices or exclude competition in the relevant market." *Dreamstime.com*, 54 F.4th at 1137 (internal citation and quotations omitted). Here, Defendant has an incentive to enter into subcontracts at rates that are to its benefit. *See Oahu Gas Serv. V. Pac. Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988) (stating that there can be no antitrust liability if the defendant has a "legitimate business justification" for its actions). Defendant also had the right to use its own logging services, subcontract with logging companies of its choice, and refuse to engage in business with Plaintiffs. *See Dreamstime.com, LLC*, 54 F.4th at 1141 ("The Sherman Act . . . does not infringe upon a company's right to freely exercise its own independent discretion as to parties with whom it will deal."). If Defendant preferred for economic purposes to use its own logging services rather than subcontract to other loggers, that was its prerogative. Such conduct does not amount to a refusal to deal for antitrust purposes.

Nor do Plaintiffs contend that Defendant had a prior profitable course of dealing with Plaintiff Prairie Wood that Defendant unilaterally terminated. *See Aspen Skiing Co. v. Aspen*

*Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985) (finding that the defendant's unilateral termination of a profitable joint venture with the plaintiff to be relevant to a refusal-to-deal antitrust claim). Plaintiffs therefore do not plead facts plausibly alleging that Defendant's alleged refusal to deal with Plaintiffs in the Logging Services Market was anticompetitive.

In the Softwood Sawlogs Market, Plaintiffs allege that when Plaintiff Prairie Wood reopened its sawmill in June 2022, it sought to buy sawlogs from Defendant. Defendant's owner stated that Defendant had no logs available for sale. According to Defendant, all of its logs were under contract to be sold to other mills. Sometime after the initial request, Defendant sold "a limited supply of logs" to Plaintiff Prairie Wood. FAC ¶ 10. But Plaintiff alleges that "there is a serious threat that Iron Triangle will immediately revert to refusing to deal with Prairie Wood." FAC ¶ 10.

Plaintiffs' allegations of anticompetitive conduct within this market fail for the same reason as in the Logging Services Market. Plaintiffs make the conclusory allegation that Defendant sought to drive them out of business to prevent them from bidding on the upcoming renewal of the stewardship services contract with the U.S. Forest Service, but Plaintiffs do not allege any facts to support this conclusion. And, in this market, Defendant *has* sold to Plaintiff Prairie Wood. Allegations of anticipated future behavior cannot satisfy the requirement to show that anticompetitive behavior resulted in monopoly power over the Softwood Sawlogs Market when such behavior may not even occur. In sum: (1) to the extent that Plaintiffs theory is that Defendant refused to deal in the Softwood Sawlogs Market, Plaintiffs' own Complaint negates that theory by admitting that Defendant has sold to Plaintiff Prairie Wood; and (2) Plaintiff cannot base its Section 2 claim on anticipated future behavior.

d.  Exclusive Dealing/Tying/Boycott[5]

Plaintiffs allege that Defendant Iron Triangle engaged in anticompetitive conduct affecting the Logging Services and Softwood Sawlog Markets by entering into an exclusive agreement that prevented the only purchaser of pine sawlogs in the market area—Defendant Malheur Lumber—from purchasing logs or logging services from any other provider. According to Plaintiffs, Defendants used this agreement to exclude them from the Logging Services Market. Plaintiffs also allege that by forcing Defendant Malheur Lumber to only purchase Defendant Iron Triangle's pine sawlogs, Defendant undermined contract logging arrangements between Logger Plaintiffs and Landowner Plaintiffs and foreclosed Plaintiff Prairie Wood from bidding competitively in mixed-species timber sales by denying Plaintiffs a market for pine sawlogs.

To begin with, the allegations in the Complaint contradict that any exclusive agreement between Defendants resulted in Plaintiffs' foreclosure from the Logging Services and Softwood Sawlogs Markets at all because Plaintiffs also allege that there was at least one other purchaser of sawlogs besides Malheur Lumber; Plaintiff Prairie Wood remains an available buyer of fir sawlogs harvested by participants in the Logging Services Market. Plaintiffs thus remain able to participate in the Softwood Sawlogs Market with respect to fir sawlogs. As for Plaintiffs' concerns about the difficulties presented by mixed-species stands in the absence of a market for pine sawlogs, their Complaint contradicts their position because it acknowledges that Malheur Lumber does remain a buyer of pine sawlogs from Iron Triangle's competitors but "at prices that

---

[5] Plaintiffs' Complaint variously refers to Defendant's alleged arrangement with Defendant Malheur Lumber as "tying," exclusive dealing, and "boycott." FAC ¶ 7, 12, 17, 35, 38, 54, 55, 88, 92. Because these descriptions all appear to describe the same conduct, the Court addresses them jointly here. *See also Eastman v. Quest Diagnostics Inc.,* 724 F. App'x 556, 557 (9th Cir. 2018) (noting that tying and exclusive dealing "are essentially the same exclusionary practice for § 2 purposes").

are uneconomical to contract loggers and private landowners." FAC ¶ 8. Plaintiffs' response

provides no explanation as to how offering uneconomical prices amounts to exclusive dealing.

Plaintiffs also fail to allege facts which, taken as true, would establish that the agreement

constituted anticompetitive conduct, even if it were an exclusive dealing agreement. *See Oahu

Gas*, 838 F.2d at 368 (noting that when the alleged monopolist has an "economic rationale" to do

so, "refusal to aid a competitor" is not "willful acquisition or maintenance of monopoly power")

(citation and brackets omitted). Indeed, "[t]here are . . . well-recognized economic benefits to

exclusive dealing arrangements[.]" *Omega Env't v. Gilbarco*, 127 F.3d 1157, 1162 (9th Cir.

1997). Businesses are free to enter into requirements contracts or other exclusive arrangements

that work to their benefit. *See Brantley*, 675 F.3d at 1202 ("Businesses may choose the manner in

which they do business absent an injury to *competition*") (emphasis added).

Distinguishing the above case law, Plaintiffs argue that "this is not a situation where a

company is merely exercising its usual right to choose its business partners," but is instead "more

akin to a group boycott," citing several cases in which the Supreme Court found such conduct to

be anticompetitive. Pl. Resp. 20, ECF 45. Plaintiffs' Complaint alleges that the agreement

between Defendants constitutes such a per se illegal boycott. FAC ¶ 55. In group boycott cases,

"where businessmen concert their actions in order to deprive others of access to merchandise

which the latter wish to sell to the public, [the Court] need not inquire into the economic

motivation underlying their conduct." *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146

(1966). But the Supreme Court has made clear that "precedent limits the *per se* rule in the

boycott context to cases involving horizontal agreements among direct competitors." *NYNEX

Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). By contrast, a vertical agreement and restraint

that "takes the form of depriving a supplier of a potential customer" is not per se illegal. *Id.* at

136. Here, Plaintiffs do not allege that Defendants are competitors. Instead, their allegations reflect a vertical agreement between a supplier and a purchaser. Plaintiffs therefore do not state a claim based on a per se illegal group boycott.

e.   Synergistic Effects of Conduct

Plaintiffs argue that the Court's analysis of whether they have sufficiently alleged anticompetitive activity should not focus on Defendant's actions individually but should instead consider the "synergistic effect" of the sum of Defendant's conduct across markets. Pl. Resp. 34. Plaintiffs contend that Defendant has engaged in a "combination of anticompetitive tactics and trade restraints that cross-pollinate" as part of a scheme to "clear the field of potential rivals that might otherwise acquire all or part of the Stewardship Contract when it is rebid in 2023." Pl. Resp. 7, ECF 45. Thus, Plaintiffs ask the Court to consider the synergistic effects of Defendant's anticompetitive activity in order satisfy this element across markets. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (holding that antitrust liability cannot be determined by "dismembering" the claim and "viewing its separate parts, but only by looking it as a whole").

Plaintiffs' reliance on *Cont'l Ore Co.* is misplaced. In that case, the plaintiff alleged that the defendant companies engaged in a concerted refusal to deal in order to restrain trade in the market for the mining and sale of the metal vanadium. *Id.* at 692-95. The plaintiff's antitrust claims in that case described the conduct taken by each defendant to advance the specific scheme to refuse to deal to plaintiff. *Id.* at 694-95. In assessing whether there was sufficient evidence to support a jury finding that defendants' acts were anti-competitive, the Ninth Circuit evaluated the conduct of each defendant individually, deciding whether the conduct of each damaged the plaintiff. *Id.* at 698. The Supreme Court held that the Ninth Circuit had erred by approaching the

plaintiff's claims against each defendant as if they were separate and unrelated. *Id.* The Supreme Court held that, when evaluating an alleged conspiracy, the "duty of the jury was to look at the whole picture and not merely at the individual figures in it." *Id.* (internal citation omitted).

Plaintiffs' contention here is different from the principle announced in *Cont'l Ore Co.* That case warned against compartmentalization of conduct by multiple defendants in furtherance of a conspiracy. Where Plaintiffs' alleged schemes involve conduct or "conspiracy" by multiple Defendants here—*e.g.*, with respect to exclusive dealing/tying/boycott—the Court's above analysis of whether Plaintiffs have stated a claim adheres to *Cont'l Ore Co.*'s directive. But Plaintiffs' argument takes its holding a step further in arguing that a court may consolidate multiple *theories* of anticompetitive conduct to decide whether Plaintiffs have pled this element of their claim. *Cont'l Ore Co.* does not so hold. Each of the anticompetitive theories Plaintiffs advance here involves a different set of rules and applicable case law for evaluating whether it is adequately pled. Plaintiffs' theory of synergistic conduct would eviscerate these bodies of case law by transforming the anticompetitive conduct element of a Section 2 claim into a "totality of the circumstances" analysis devoid of any guidelines by which to evaluate the legality of such conduct. None of Plaintiffs' cited cases stand for this proposition. Because Plaintiffs have not pled sufficient facts to allege any of their theories of anti-competitive conduct, they have failed to state a Section 2 monopolization claim.

### iii. Causal Antitrust Injury

Finally, a plaintiff must have suffered an "antitrust injury," meaning an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). Plaintiffs "must prove that [their] loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses

stemming from acts that do not hurt competition." *Rebel Oil*, 51 F.3d at 1433 (citing *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990)). To plead antitrust injury, Plaintiffs must plead "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent…[and (5)] the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

Plaintiffs summarize their pleading of antitrust injury by stating that "Iron Triangle's monopolization of the relevant product markets through both independent conduct and its conspiracy with Malheur Lumber has caused substantial antitrust injury to plaintiffs while subverting the objectives of the Stewardship Contract." Pl. Resp. 13. Defendant argues that Plaintiffs have failed to plead facts to allege causal antitrust injury in any of the four alleged markets.[6]

a.   Logging Services Market

Logger Plaintiffs allege that Defendant excluded them from the Logging Services Market by offering them uneconomical subcontract rates. Plaintiffs contend that they suffered damages in the form of lost profits, but they fail to explain how Defendant's alleged subcontract rates hurt competition in the Logging Services Market as a whole. Seeking the lowest possible price for subcontracts is pro-competitive behavior, which in the end, should lower the costs of the product for consumers. *See Rebel Oil*, 51 F.3d at 1433 ("[R]eduction of competition does not invoke the

---

[6] As explained later in this opinion, *infra* V, the Court denies Defendant leave to amend its Complaint with respect to Section 2 claims within the Stewardship and Harvest Rights Markets. For this reason, the Court limits its analysis of the Complaint's pleading of antitrust injury to the two remaining markets Plaintiffs may amend: Logging Services and Softwood Sawlogs Markets.

Sherman Act until it harms consumer welfare."); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from failure of the market."). Similarly, Defendant Malheur Lumber's choice to exclusively buy logging services from Defendant Iron Triangle does not amount to antitrust injury, even if Logger Plaintiffs have lost business to their competitor and have lost profits as they contend. There is no antitrust injury simply because a plaintiff loses sales to a competitor because "antitrust laws prohibitions focus on protecting the competitive process and not the success or failure of individual competitors." *Cascade Health Sols.*, 515 F.3d at 902.

In addition, Plaintiffs do not plead sufficient facts to plausibly allege that Plaintiff Prairie Wood or the Landowner Plaintiffs specifically are participants in the Logging Services Market at all. To the extent that this market forms the basis of Plaintiffs' Section 2 claim, Plaintiff Prairie Wood and the Landowner Plaintiffs fail to state a claim for this additional reason.

a.    Softwood Sawlogs Market

As with the Logging Services Market, Plaintiffs' Complaint fails to allege how Defendant's conduct hurts competition in the Softwood Sawlogs Market. Plaintiffs do not plausibly allege that buyers of softwood sawlogs must pay supra-competitive prices in the market area, nor that sellers within the market are foreclosed from participating in it. Thus, Plaintiffs do not adequately allege antitrust injury in the Softwood Sawlogs Market and therefore fail to state a claim for monopolization of that market.

**III.    Conspiracy to Restrain Trade, 15 U.S.C. § 1**

In their second claim for relief under Section 1 of the Sherman Act, Plaintiffs allege that Defendants entered a "combination and conspiracy whereby Malheur Lumber refuses to deal with Iron Triangle's competitors in order to foreclose their ability to sell pine sawlogs locally

and thereby undermine their ability to compete with Iron Triangle in monopolized markets."
FAC ¶ 107. Plaintiffs' claim hinges on the alleged "tying arrangement" between Defendant Iron Triangle and Defendant Malheur Lumber.

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Brantley*, 675 F.3d at 1196–97 (quoting 15 U.S.C. § 1). To state a claim for violation of Section 1, a plaintiff must plead facts that show: (1) a contract, combination, or conspiracy between two business entities; (2) by which the entities intended to harm or restrain trade or commerce; (3) which actually injures competition; and (4) the plaintiff suffered harm that flowed from the anti-competitive aspect of the conspiracy. *Id.* at 1197 (citing *Atl. Richfield Co.*, 495 U.S. at 334).

### A. Conspiracy Agreement in Restraint of Trade

As to the first two elements, because Section 1 prohibits only those unreasonable restraints on trade "effected by contract, combination, or conspiracy . . . 'the crucial question' is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (citation and brackets omitted). To state a claim for conspiracy, a plaintiff must plead "enough factual matter (taken as true) to suggest an agreement was made." *Id. at 544.* Terms like "conspiracy" or "agreement" without further factual enhancement "stops short of the line between possibility and plausibility." *Id.* at 557. An express allegation of agreement must include mention of specific details including the "specific time, place, or person involved in the alleged conspiracies." *Id.* at 565 n. 10. A plaintiff may also allege a conspiracy agreement through circumstantial evidence in the form of "plus factors" such as "price parallelism, product uniformity, exchange of price information, and opportunity to meet

to form anti-competitive policies." *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 525–26 (9th Cir. 1987).

Defendants argue that Plaintiffs' Complaint does not allege facts sufficient to support either an express agreement or an agreement that can be inferred from allegations of circumstantial evidence. Plaintiffs' response does not appear to contest that the Complaint does not allege express agreement but argues the Complaint pleads various plus factors sufficient to plausibly allege a conspiracy agreement circumstantially. Plaintiffs' conspiracy theory is based on the alleged tying agreement between Defendants.

The Court does not reach whether Plaintiffs have adequately pled "plus factors" evidencing a conspiracy because—even if there were an agreement between Defendants— Plaintiffs fail to plead facts sufficient to establish that the agreement at issue was unlawful. In evaluating whether any alleged agreement constitutes a Section 1 antitrust violation, "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). Plaintiffs allege that Defendant Iron Triangle agreed to supply all of Defendant Malheur Lumber's sawlog requirements in exchange for Malheur Lumber agreeing to not purchase sawlogs and contract logging services from Plaintiffs. Plaintiffs ask the Court to infer a conspiracy from the fact that both events occurred: Defendant Iron Triangle supplied Defendant Malheur Lumber's requirements for sawlogs and Malheur Lumber declined to buy sawlogs or logging services from Plaintiffs.[7] But Plaintiffs allege no facts to support an antitrust connection between these events.

---

[7] Defendant Malheur Lumber did, in fact, agree to buy sawlogs from Plaintiffs Rude Logging and Engle Contracting. But as alleged, Malheur Lumber quoted Plaintiffs uneconomically low prices for the logs.

The facts alleged could just as easily suggest a logical legitimate business reason, for example that Defendant Malheur Lumber did not purchase sawlogs or logging services from Plaintiffs because its requirement for sawlogs had already been met.

The typical conspiracy in a Section 1 claim involves a horizontal arrangement between competitors in a market to fix prices in a manner that drives out competition. Plaintiffs argue that the facts here track those in *Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983). In *Reid Brothers*, the Ninth Circuit affirmed the district court's finding of liability under Section 1 of the Sherman Act. *Id.* at 1298. The defendants were two timber companies that had been awarded long-term government contracts that allotted each the rights to specific logging areas for a fifty-year period. *Id.* at 1295. The court found that the defendants had conspired to restrain trade by refusing to compete to keep timber acquisition costs and log prices artificially low and to exclude new entrants from the market. *Id.* at 1296-98.

In *Reid Brothers*, the two defendants who engaged in the conspiracy were in a horizontal relationship with each other as competitors. In contrast, Plaintiffs' allegations here are consistent with a vertical trying arrangement, not one between competitors. A tying arrangement is one where a "seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product). *Aerotec Int'l*, 836 F.3d at 1178 (quoting *Cascade Health Sols.*, 515 F.3d at 912). Through a tying arrangement, "a seller with market power in one market extends its market power to an entirely distinct market." *Id.* (citation, ellipses, and brackets omitted). To establish a Section 1 antitrust claim based on tying, a plaintiff must show:

> (1) that the defendant tied together the sale of *two distinct products or services*; (2) that the defendant had sufficient economic power in the tying product's market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

*Cascade Health Sols.*, 515 F.3d at 913 (emphasis added). Plaintiffs assert that Defendant Iron Triangle conditioned its sale of softwood logs to Defendant Malheur Lumber on Malheur Lumber agreeing not to purchase logging services from any other company. In other words, the allegedly "tied product" is logging services.

However, from the perspective of a sawmill, sawlogs and logging services are not two distinct products and the markets for each are not distinct markets. To be distinct markets, "[t]here must be a sufficient demand for the purchase of the tied product separate from the tying product." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975 (9th Cir. 2008). In this case, the market for softwood sawlogs and for logging services are inextricably intertwined. As Plaintiffs explain, sawmills like Malheur Lumber acquire sawlogs by purchasing them from logging companies, by engaging the services of logging companies to harvest timber from forests over which it has harvest rights, or by participating in contract logging agreements between loggers and private landowners. Thus, production of the end product—sawlogs—involves a necessary interaction between the market for sawlogs and the market for logging services. Plaintiffs fail to show that Defendant Malheur Lumber's purchase of sawlogs from Defendant Iron Triangle is distinct from its purchase of logging services. From Malheur Lumber's perspective, both the direct purchase of sawlogs and the purchase of logging services provide it with the sole product it needs for its mill—sawlogs.

Accordingly, Plaintiffs fail to plead facts sufficient to allege an illegal tying arrangement which forms the basis of its Section 1 claim.

### B.    Antitrust Injury

Plaintiffs also do not adequately plead facts to show antitrust injury flowing from the alleged conspiracy, which is necessary to satisfy the third and fourth elements of a Section 1 claim. *See Brantley*, 675 F.3d at 1197. To plead injury to competition, "a section one claimant

may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 507–08 (9th Cir.1989). "[A] complaint's allegation of a practice that may or may not injure competition is insufficient to 'state a claim to relief that is plausible on its face.'" *Brantley*, 675 F.3d at 1198 (quoting *Twombly*, 550 U.S. at 570). To state a Section 1 claim, plaintiffs must plead an injury to competition beyond the impact on themselves. *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir.1988).

The Court has already explained that Plaintiffs have failed to allege facts consistent with antitrust injury in each market in the Section 2 context. For similar reasons, Plaintiffs have failed to plead antitrust injury as to their Section 1 claim. Specifically, even if Plaintiffs could show the existence of a tying arrangement, they do not allege injury of the type anticipated by antitrust laws. *See Brunswick Corp.*, 429 U.S. at 489. To survive Defendants' motions to dismiss, Plaintiffs must "allege facts showing that an injury to *competition* flows from [the] tying arrangement[]." *Brantley*, 675 F.3d at 1201 (emphasis added). Even if Defendants had agreed to deal exclusively with each other for the purpose of excluding Plaintiffs from the market, Plaintiffs do not allege facts showing harm beyond themselves. *See Brantley*, 675 F.3d at 1202 (holding that the plaintiffs did not show antitrust injury when their "allegations show only that plaintiffs have been harmed as a result of the practices at issue, not that those practices are anticompetitive"); *Oahu Gas*, 838 F.2d at 370 ("The goal of the antitrust laws . . . is to safeguard general competitive conditions, rather than to protect specific competitors").

Thus, along with failing to allege a conspiracy, Plaintiffs do not adequately allege antitrust injury. Accordingly, Plaintiffs fail to state a plausible claim for conspiracy in restraint of trade under Section 1 of the Sherman Act.

## IV.    Defendants Russell Young and I.T. Logging

Defendant Iron Triangle's motion also seeks dismissal of Defendants Russell Young and I.T. Logging. Plaintiffs do not oppose the motion to dismiss Defendant Russell Young. Iron Triangle Def. Mot. to Dismiss 1, ECF 35. As for Defendant I.T. Logging, Plaintiffs did not address this portion of Defendant's motion and the Court deems it conceded. *Bojorquez v. Wells Fargo Bank, NA*, No. 6:12-CV-02077-AA, 2013 WL 6055258, *5 (D. Or. Nov. 7, 2013) ("[i]f a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded") (quoting *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C.2002)). Accordingly, the claims against Defendants Russell Young and I.T. Logging are dismissed.

## V.    Leave to Amend

A party may amend its pleading once as a matter of course or, thereafter, "only with the opposing party's written consent or with the court's leave." *Fed. R. Civ. P. 15(a)(1)-(2)*. The court should freely give leave when justice so requires." *Id.* However, the court need not grant leave to amend where the amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1116 (9th Cir. 2014) (internal quotation omitted). Amendment is futile "only if no set of facts can be proved ... that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

The Court finds that most deficiencies in Plaintiffs' Complaint can be cured by amendment. However, Plaintiffs can plead no set of facts which could establish monopoly in the Stewardship Services Market or monopsony in the Harvest Rights Market. As discussed above,

the U.S. Forest Service is precluded from being charged supra-competitive prices or selling timber below appraised value or minimum stumpage rates in these two markets respectively, and Defendant lacks the power to control prices or preclude other bidders. These deficiencies cannot be cured and amendment would therefore be futile. Plaintiffs may plead that Defendants' actions within in those markets—even if Defendants do not have monopoly or monopsony power—have impacts downstream, but Plaintiffs cannot plead monopoly/monopsony power in the Stewardship Services Market or Harvest Rights Market.

In sum, the Court grants Plaintiffs leave to amend their Complaint except with respect to Section 2 claims premised on alleged monopolization of the Stewardship Services Market or Harvest Rights Market.

## VI.    Motion to Strike

Defendant Iron Triangle also moves in the alternative to strike paragraphs 61 through 74 of Plaintiffs' First Amended Complaint which pertain to the events underlying the *Reid Bros. case*, 699 F.2d 1292. Because the Court grants Plaintiffs leave to amend their Complaint, the Court will address this alternative argument.

The relevant section of Plaintiffs' Complaint begins by noting that "[i]f the Forest Service had examined its history of timber sale contracting on national forests in the West before deciding to offer a 10-year stewardship contract granting 70% of the annual timber harvest on the Malheur National Forest to a single firm, the agency would never have seriously considered this option." FAC ¶ 61. It then recounts events in the 1950s through 1970s relating to the Forest Service's contracting within the Tongass National Forest in Alaska which resulted in the *Reid Bros.* case. Plaintiffs compare the facts at issue there to the facts here and argue that *"Reid Bros.* is binding precedent, and taking plaintiffs' allegations a true, infers antitrust injury as a matter of law." Pl. Resp. 32, ECF 45.

The court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). Granting a motion to strike is within the discretion of the district court. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (motion to strike under Rule 12(f) reviewed for abuse of discretion). Rule 12(f) motions to strike are viewed with disfavor and are infrequently granted. *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008), *aff'd*, 608 F.3d 1084 (9th Cir. 2010); *see also Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014) ("Motions to strike are regarded with disfavor because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings.") (quotation marks and alterations omitted). The court views the pleadings in the light most favorable to the nonmoving party when considering a motion to strike. *Scott v. PacifiCorp*, No. 1:22-CV-00174-AA, 2022 WL 2452281, at *1 (D. Or. July 6, 2022). The court may require a showing of prejudice when considering a motion to strike. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993) (finding risk of prejudice where the allegations at issue involved "stale and barred charges," would have been burdensome to answer, and were likely to lead to unwarranted prejudicial inferences), *rev'd on other grounds*, 510 U.S. 517 (1994).

Plaintiff argues that "[t]he Court will make a series of legal rulings throughout the case, and the context provided by the allegations contained in paragraphs 61 through 75 is helpful to that analysis and directly relevant to plaintiffs' claims." Pl. Resp. 25. The Court agrees that the *Reid Bros.* case may be relevant to this Court in deciding motions that come before it—indeed, the parties cite it throughout their briefing on the instant motion—but relevance to this Court's

resolution of the legal issues in the case does not mean that such facts are appropriate for inclusion in the Complaint itself.

In *Fantasy, Inc.*, the district court struck "superfluous historical allegations" pled to provide "background" because they "did not involve the parties to the…action, but rather consisted of stale and barred charges that had already been extensively litigated and would have been burdensome for [the defendant] to answer." 984 F.2d at 1527-28. The Ninth Circuit agreed, explaining that the district court "correctly noted that the [historical background] allegations created serious risks of prejudice to [the defendant], delay, and confusion of the issues." The same is true here, where the events underlying *Reid Bros.* do not involve the same parties and the allegations are only offered to provide historical background that does not directly pertain to the issues here. A court may grant a motion to strike "for the purpose of streamlining the ultimate resolution of the action and focusing the jury's attention on the real issues in the case." *Id.* The Court exercises its discretion to do so here, and grants Defendant's motion to strike paragraphs 61 through 75 of Plaintiff's First Amended Complaint.

## CONCLUSION

Plaintiffs fail to state claim under Section 1 or Section 2 of the Sherman Act. As for Plaintiffs' Section 2 claim in the four alleged markets, the Court recognizes that the allegations in Plaintiffs' complaint are complex and that general large-scale cross-market allegations may help put their claims in context. However, Section 2 claims are necessarily evaluated on a market-by-market basis, and Plaintiffs' Complaint stops short of plausibly alleging all the required elements to state a Section 2 monopolization claim in any of the four alleged markets individually. Accordingly, Plaintiffs' Section 2 claim is dismissed for failure to plead monopolization of at least one of the alleged markets. The Court grants Plaintiffs leave to amend this claim related to the Logging Services Market and Softwood Sawlog Market.

Plaintiffs also fail to allege facts sufficient to support a Section 1 claim against Defendants Iron Triangle and Malheur Lumber because the alleged arrangement between Defendants is not an illegal conspiracy in restraint of trade. This claim is therefore dismissed with leave to amend.

Thus, the Court GRANTS Defendants' Motions to Dismiss [35][40] and Plaintiffs' First Amended Complaint is dismissed with leave to amend except with respect to Section 2 monopolization claims in the Stewardship Services and Harvest Rights Markets. The Court also GRANTS Defendants' Motion to Strike [35][40], and GRANTS in part and DENIES in part Defendant Iron Triangle's Motion for Judicial Notice [36]. Plaintiffs shall file their amended complaint within 30 days of this Opinion & Order.

IT IS SO ORDERED.

DATED:  October 13, 2023  .

MARCO A. HERNÁNDEZ
United States District Judge